# Richmond.

## COLVIN v. COMMONWEALTH.

### March 17, 1927.

1. APPEAL AND ERROR—*New Trial—Verdict Contrary to the Evidence—Conflicting Evidence—Where Jury could have Found Either Way.*—In the instant case, a prosecution for malicious wounding, no complaint was made of the action of the trial court in granting and refusing instructions, and it was admitted that "the evidence for and against the petitioner on the merits of the case was such as that the jury could have convicted or acquitted, the petitioner claiming the shot fired was the result of an accident, while the theory of the Commonwealth was that it was a wilful and deliberate shooting."

   *Held:* That the verdict could not be said to be contrary to the evidence.

2. CRIMINAL LAW—*Character in Evidence—Where Accused has not Put His Character in Issue.*—It is well settled in this State that evidence of the bad general reputation of one on trial for an offense cannot be offered by the Commonwealth unless the accused has put such character in issue by first offering evidence of his good general reputation.

3. CRIMINAL LAW—*Character in Evidence—Whether Accused has Put His Character in Issue—Case at Bar.*—In a prosecution for malicious wounding, on cross-examination of a witness for the Commonwealth, the witness testified that accused when drunk became "wild and crazy" and that he was not that way when not under the influence of liquor.

   *Held:* That the question put the character of accused in issue as a necessary inference was that when he was sober he was peaceable and orderly. This put in issue his character for peace and good order, when not under the influence of liquor, and warranted inquiry on that subject by the Commonwealth.

4. CRIMINAL LAW—*Character in Evidence—Harmless Error—Case at Bar.*—In the instant case, a prosecution for malicious wounding, counsel for the Commonwealth asked a witness, who had testified without objection that accused was drinking and in a quarrelsome mood, and that he was "pretty fussy" when drunk, what was accused's reputation in the community for peace and good order, and witness was permitted to answer over the objection of the accused that it was bad. No other witness was asked a similar question. The witness was a party to

the controversy and a hostile witness against accused. There was no question but that accused was not sober at the time of the malicious wounding.

*Held:* That the single question asked an interested and hostile witness, even if improper, would not justify a reversal in the absence of any other good cause therefor.

5. CRIMINAL LAW—*Proof of other Crimes—General Rule—Motive—Exception.*—Generally, it is not competent, on the trial of a criminal case, for the Commonwealth to offer testimony of a prior, independent crime. Such testimony is not within the pleadings, and would be an unfair surprise and prejudicial to the accused, who does not come to the trial prepared to vindicate every act of his past life. But the exception to the rule is as well established as the rule itself that such testimony is admissible, where it shows motive, intent or guilty knowledge, or is connected with or leads up to the offense for which the accused is on trial.

6. CRIMINAL LAW—*Proof of other Crimes—Connection between the Crimes—When Admissible—Case at Bar.*—In the instant case, a prosecution for malicious shooting, a witness for the prosecution was allowed to testify as to an attempt of accused to shoot him eleven years previously. It was the theory of the Commonwealth that accused intended to shoot this witness but shot another by mistake. And witness's wife was also allowed to testify as to this prior shooting. The two events were connected by the subsequent acts and declarations of accused.

*Held:* That while the single act of the prior shooting would not have been admissible, yet when this act was simply a link in a chain showing a well connected whole, the trial court did not abuse its discretion in admitting evidence thereof.

Error to a judgment of the Circuit Court of Fauquier county.

*Affirmed.*

The opinion states the case.

*Grimsley & Miller* and *Chas. G. Stone,* for plaintiff in error.

*John R. Saunders, Attorney General, Leon M. Bazile* and *Lewis H. Machen, Assistant Attorneys General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The accused was convicted of malicious wounding and sentenced to the penitentiary for three years. The person wounded was Lamar Colvin, his cousin, with whom he was on very friendly terms. The theory of the prosecution was that he intended to shoot his brother-in-law, Cal Heflin, and shot his cousin by mistake. The defense of the accused was that the shooting was accidental.

Eleven years or more prior to the present controversy, and before Heflin had married the sister of the accused, he had shot Heflin in the ear, claiming to have found him and his sister in a compromising position. "There was a little scrap afterwards over it," but nothing further was done. Heflin "had some trouble with him," but had "gotten along with him." Mrs. Heflin testified that "they had trouble several times." The accused, when drinking, was "fussy," and Mrs. Heflin testified that "more or less every time he is drinking he takes his spite out on me;" that he struck her once or twice, and that "whenever he gets drunk I just try to keep out of his way."

On Saturday night, November 21, 1926, there was a corn-shucking at the home of the father of the accused, at which there were present, on the invitation of the father, the accused, Cal Heflin and his wife, Lamar Colvin, Will Colvin and several others of the family connections. During the shucking, some kind of intoxicating drink was passed around several times, and all of them, more or less, "felt their liquor." About ten o'clock they were invited to the house to supper. The house contained but two rooms, a kitchen and another room, which were separated by a vestibule or hall about four feet square. When the parties came to

the house, Mrs. Heflin was in the kitchen, and the accused walked up to her, and, as she says, hit her on the top of her head.    Lamar Colvin remonstrated with him about it, and Cal Heflin came in about that time and he and the accused engaged in a fight, but they were separated and Heflin went out of the house, but came back and he and his wife and children then went home.    Heflin says that the accused saw him go out, but whether he saw him go when he went with his family, he does not know, but thinks he could not have seen him from the position he occupied.    Heflin further testified that he went back again into the house, and as soon as he went in he heard the accused "hollering for his gun;" that the accused called to his wife to get his gun; that the accused said, "I shot him eleven years ago, and, damn him, I will get him this time sure."    When the parties were separated in the kitchen, the father of the accused pushed him back into the other room and against the window which was broken out.    The accused then got possession of his rifle, and it was discharged, resulting in seriously wounding Lamar Colvin, his cousin, who was just entering the room, which was dark.    The accused claims that the gun fell across his feet in the scuffle, and that he picked it up and it went off accidentally in his hands, but the wound showed that the bullet had gone straight through Lamar, horizontally, and on the night of the shooting and shortly thereafter the accused told a disinterested witness, "Mr. Crabtree, I got the wrong man."    The doctor who attended Lamar Colvin that night also testified that "Leroy said words to the effect that he had shot but had not hit the object he shot at; that he did not shoot to hit Lamar Colvin.    He used some such expression as Lamar Colvin was not what he shot at."    On cross-examination, he testified in part as follows:

"Q. The effect then was what you said, that he didn't hit the object he was aiming at?

"A. That he shot to hit something or some person and that hitting Lamar Colvin was an accident, but that the shooting was not an accident. That was what I got from his expression."

The testimony shows that all of the parties were drinking, and one witness, a preacher, says that the accused was "about two-thirds drunk," but the testimony for the Commonwealth abundantly shows that he knew very well "what he was doing."

[1] No complaint is made of the action of the trial court in granting and refusing instructions, and it is admitted that "the evidence for and against the petitioner on the merits of the case was such as that the jury could have convicted or acquitted, the petitioner claiming the shot fired was the result of an accident, while the theory of the Commonwealth was that it was a wilful and deliberate shooting." Hence, the verdict cannot be said to be contrary to the evidence.

The ground on which reversal is sought is the admission of improper evidence. There are a number of specifications on this subject, but they may all be reduced to two: (1) Did the trial court err in permitting Cal Heflin to testify as to the reputation of the accused for peace and good order? (2) Did the trial court err in permitting Cal Heflin and his wife to testify as to the shooting of Cal Heflin in the ear by the accused more than eleven years ago?

[2] There is much to be said in favor of putting before the jury a man's general reputation in the community relevant to the character of the offense with which he is charged, though not first put in issue by him, but it is conceded by the Attorney

General to be well settled in this State that evidence of the bad general reputation of one on trial for an offense cannot be offered by the Commonwealth unless the accused has put such character in issue by first offering evidence of his good general reputation. *Price* v. *Commonwealth*, 21 Gratt. (62 Va.) 846, 868; *Mitchell* v. *Commonwealth*, 140 Va. 572, 125 S. E. 311.

[3, 4] The trial court, however, thought that the accused had put his reputation as a peaceable and orderly man in issue by his cross-examination of a witness for the Commonwealth. That cross-examination was as follows:

"Q. What effect does liquor have on him?

"A. Well, I don't know.

"Q. Doesn't it make him wild and crazy?

"A. It seemed that way.

"Q. He is not that way when he is not under the influence of liquor, is he?

"A. No, sir.

"Q. And he was that way that night, wasn't he?

"A. Yes, sir."

The same witness, later on, also testified that when the accused got drunk, he was "right fussy." The question: "Doesn't it make him wild and crazy?" conveys the idea that he was not peaceable and orderly; that he would not respect the rights of others, and that he would act like one who was not merely insane but along with it was wild, unbridled, and bent on having his own way. Such was his condition when under the influence of liquor, but he was not that way when not under such influence. The necessary inference is that when he was sober, he was peaceable and orderly. This put in issue his character for peace and good order, when not under the influence of liquor, and warranted inquiry on that subject by the Commonwealth.

Cal Heflin, the man who had a fight with the accused on the night of the shooting and against whom the shot was supposed to have been directed, after testifying without objection that the accused was drinking and in a quarrelsome mood, and that he was "pretty fussy" when drunk, was asked: "What was the reputation of the accused in the community in which he lives for peace and good order?" and was permitted to answer, over the objection of the accused, that it was bad. No other witness was asked a similar question. Heflin was a party to the controversy and a hostile witness. It is not probable that the jury gave much if any weight to his opinion on this subject. All of the witnesses on both sides testify that the accused was under the influence of liquor at the time of the shooting. They vary only as to the degree. His reputation, when sober, even if proved by disinterested witnesses, could not have seriously affected the result. He was not sober, and the single question asked an interested and hostile witness, even if improper, would not justify a reversal, in the absence of any other cause therefor.

[5, 6] The trial court committed no error in refusing to exclude the testimony of Heflin and his wife as to the shooting of Heflin by the accused eleven years previously. The evidence on this subject has been hereinbefore recited. Generally, it is not competent, on the trial of a criminal case, for the Commonwealth to offer testimony of a prior, independent crime. Such testimony is not within the pleadings, and would be an unfair surprise and prejudicial to the accused, who does not come to the trial prepared to vindicate every act of his past life. But the exception to the rule is as well established as the rule itself, that such testimony is admissible, where it shows motive, intent

or guilty knowledge, or is connected with or leads up to the offense for which the accused is on trial. 1 Wig. Ev., section 396.

The single act of the prior shooting of Heflin, standing alone, would not have been admissible. But this act was simply a link in a chain, showing a well connected whole. The prior shooting was followed by "a little scrap afterwards over it," and "trouble several times" between the parties, by hostilities towards Mrs. Heflin and assaults on her, and on the night of the shooting the accused called for his gun that he might complete the job he had begun eleven years before; and a short while afterwards, on the night of the shooting, he stated that the shooting was not accidental, but that he "got the wrong man." The prior shooting is fully connected with the offense on trial by the declarations of the accused himself, and the trial court committed no error in admitting the testimony relating thereto. It evinced both motive and intent.

It is true that considerable time elapsed between the first offense and the present one, but they were connected by the subsequent acts and declarations of the accused, especially on the night of the shooting, and the trial court did not abuse its discretion in admitting evidence thereof.

We find no error in the proceedings of the trial court and its judgment is affirmed.

*Affirmed.*