# Richmond

JAY R. TIMMONS v. COMMONWEALTH OF VIRGINIA.

March 4, 1963.

Record No. 5539.

Present, All the Justices.

The opinion states the case.

*William King Mapp (Mapp and Mapp,* on brief), for the plaintiff in error.

*William P. Bagwell, Jr., Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Jay R. Timmons was, at the February, 1962, term of the Corporation Court of the City of Norfolk, Part Two, indicted for the murder of Ann E. Bannon. The indictment was of the statutory short form, Virginia Code, § 19.1-166. He was tried on April 17 and 18, 1962, upon a plea of "not guilty by reason of insanity." The jury found him guilty of murder of the first degree and fixed his punishment at death. On June 11, 1962, motions to set aside the verdict were overruled and judgment was entered in accordance with the verdict. Counsel for the defendant duly excepted on the ground that the judgment was contrary to the law and the evidence. We granted writ of error.

The facts are in little conflict, save as to the mental condition of the defendant at the time of the homicide.

The evidence and the circumstances of this proceeding may be summarized as follows:

On October 19, 1961, Mrs. Ruth Lewis, 24 years of age, went to the home of her cousin, Mrs. Ann E. Bannon, at 221 Fife Lane, Norfolk. As she entered the house Mrs. Bannon was seated at her writing desk. Mrs. Lewis said that as she took a seat, Timmons emerged from the bathroom of the house, spoke to her, and walked by her over to the front door. She turned to ask Ann what she was doing, and at this time Timmons drew a gun out of his pocket, aimed at her legs, and fired. Her legs were crossed, and the shot went through both legs. Ann screamed: "What have you done?" Timmons said: "Look you two, this was an accident." He then slammed and locked the front door. Ann said: "All right, but I will have to call an ambulance." Ann ran to the bedroom where the telephone was, and Timmons ran after her and caught hold of her. She struggled and screamed until she got away from him. She was unable to get to the telephone, so she ran out of the bedroom and tried to get out of the front door. Timmons again ran after her and grabbed her.

He pulled her in front of Ruth and shot her, and "there was a series of shots" following. Three bullets hit Ann, and she fell to the floor and didn't move. One of the shots hit Mrs. Lewis in the back of her neck, the bullet lodging in the roof of her mouth. She said she could not see anything of Ann except the upper portion of her body, because she was unable to move due to her wounds; but she did hear Timmons "ripping at" Ann's clothes. After that, Timmons went back to Ruth, took her by her ankles, pulled her out of the chair on to the floor, tore her dress and undergarments, and raped her for "a couple of minutes." He then went back to Ann "for a minute or so," then returned immediately to Ruth, and raped her a second time. Afterwards he went to the kitchen and she heard water running. Next he went to the telephone, called the police department, and said to Ruth: "I had better get you to the hospital." He took her to the hospital. In the meantime, Ann Bannon had died as a result of her wounds. When the defendant telephoned, he told someone who he was and that he had killed two women. After taking Ruth to the hospital, Timmons returned to Mrs. Bannon's home, where he was arrested by the police.

The Commonwealth introduced in evidence, over the objection of the defendant, photographs of Ann Bannon's body showing the body from different angles, and also some "slides" showing the course of the bullets through her body. The photographs were taken shortly after Mrs. Bannon was shot and before her body was moved. They show Mrs. Bannon's body lying on her back, with her dress pulled up above her waist, and her undergarments pulled down below her knees. The "slides" showed where three bullets entered the body of Mrs. Bannon and where two left. At least two entered from the back of her body. The defendant objected to the introduction of the photographs on the ground that they would inflame the jury against him; while the Commonwealth asked that they be admitted under its theory that the killing was done in the commission of, or attempt to commit rape, and showed the motive of the defendant. No exception was taken as to the admission of the "slides."

Sergeant W. E. Farr, of the Norfolk Police Department, testified that he arrived at the scene of the killing about 5:30 p. m. on October 19, 1961; and that he saw the defendant the next day, at which time the defendant freely and voluntarily described the events which took place at the Bannon residence at the time of the killing. Defendant first told the officer that he drank a beer or two, bought some whiskey, and after a trip to Virginia Beach and a "little crap game,"

had another beer, came back to Norfolk, and didn't remember anything after that time. Being reminded that he had left out the most important facts, defendant said: "Well, I will tell you about it," and then voluntarily signed the following statement, which was written by Officer Farr:

"Q. Tell us, in your own words what happened at 221 Fife Lane, October 19, 1961, at approximately 5:15 P. M.

"A. About 5:00 P. M. I went by Ann's house and she let me in the front door. Ruth came up and came in the house. She sat down in the big chair in the living room in front of the window. I went to the bathroom and came out and stood by the front door. Ann was either standing or sitting at the desk by the door.

"I pulled the pistol from my hip pocket and started shooting. A bullet hit Ruth first and Ann ran into the bedroom and grabbed the phone and I pulled her away from the phone. She ran back into the front room and I started shooting again, but I don't know how many times I shot.

"Ann ran for the front door when I was shooting and I pulled her away from the front door and I shot her then. After I shot her, I turned around and shot again. I don't know if it was Ruth or Ann. Then I walked over to Ruth and I raped her and I walked over to Ann, turned her over. She was laying sideways and opened her eye up. She was trembling then. I might have pulled her clothes down but I didn't rape the girl.

"I called the police operator and I came back and put Ruth in my arms and carried her to DePaul Hospital. I carried her in and laid her on the stretcher. I got in the car and came back to Ann's house. I walked up to the motorcycle officer and handed him the keys and the next thing I was in the police car.

"Q. Jay, you were treated for overdose of sleeping pills. Tell us when you took them.

"A. After I realized what I had done, I wanted to die and I took the pills.

"Q. Where did you get the pills?

"A. I had them with me when I went there.

"Q. How much had you had to drink?

"A. Part of a pint of whiskey and four or five beers.

"Q. What time did you quit work?

"A. About 4:00.

"Q. You refer to Ann. Do you mean Ann Bannon?

"A. Yes, sir.

"Q. You refer to Ruth in your statement. Do you mean Ruth Davis Lewis?

"A. Ruth Davis. I don't know her last name.

"Q. Where did you get the gun?

"A. Ben Williams, second house past Princess Anne Road on Chapel Street.

"Q. How long had you had it?

"A. About one day.

"Q. How much did you pay for it?

"A. I borrowed it from him. I had borrowed it before because I carried a good bit of money at times and my gun had been stolen at Virginia Beach.

"Q. I show you a 32 calibre automatic Serial No. 898294. This is the gun used on Ann and Ruth?

"A. Yes.

"Q. How long have you known Ann?

"A. Twenty years. We growed up together in Berlin, Maryland, along with Ruth.

"Q. What did Ruth say to you before you raped her?

"A. Nothing that I recall.

"Q. Are you comfortable at this time?

"A. You are treating me all right.

"Q. Why did you go to Ann's house?

"A. I don't know. I just went there. I knew her father and mother and I had been there several times before.

"Q. Had you had intercourse with Ann?

"A. No, sir.

"Q. Had you had intercourse with Ruth before this happened?

"A. No, sir.

"Q. Is this statement the truth to the best of your knowledge and belief and given freely without threat or promise by us or any member of the Norfolk Police Division?

"A. That's right.

"Q. Anything else you care to say?

"A. That's all, I guess. I want to die. I ain't got nothing to live for."

The defendant introduced two psychiatrists as witnesses. Dr. Dietrich Heyder, who examined the defendant about 11:00 a. m. the day after the crime, said, in part: "It could be observed that this man was at the time in practically perfect mental health and

there was no disturbance of the mental status." The other psychiatrist, Dr. Robert H. Thrasher, was of opinion that defendant was in a psychotic state on the day of the crime, and that he "wouldn't trust" the defendant not to kill Ann Bannon again if she were living, and that the same applied also to other persons. He further said that he had a "sick, mixed up mind," and that, "Even the stress of normal living outside may bring out his hostile, aggressive impulses."

In rebuttal, Dr. Joseph R. Blalock, Superintendent of the Southwestern State Hospital, testified that from his observation of the defendant, the defendant knew the difference between right and wrong and could adhere to the right. Dr. Charles Nemeth, who had made a closer examination and observation of the defendant at the State Hospital, said he found the patient neither psychotic nor insane, and that he knew the difference between right and wrong.

The evidence shows that the murder weapon, a 32 calibre pistol, was apparently stolen from H. C. Divers, the owner, between the latter part of September, 1961, and the day of the murder.

On the afternoon of the murder, Mrs. Mary Ballard, who lives on Fife Lane about four doors from the residence of Mrs. Ann Bannon, observed a blue Jeep stationwagon, with "Virginia Lee Hotel" written on it, circling around the block where she lived between 3:30 and 4:30 p. m. Timmons was shown to have had such a wagon in his custody.

Police Detective Fred Henley testified that he took the defendant into custody about 6:00 p. m. on October 19, at Mrs. Bannon's home; that Timmons appeared to be in "a subdued, quiet condition," talked coherently, was sober, and there was nothing unusual in his behavior or manner. The officer in examining the body and clothing of Timmons found "red smears that indicated them to be blood" on the fly of his trousers. He asked the defendant if he had shot a person. Timmons replied, saying he had not shot a woman; that he had driven to a house with another man; that that man got out of the car and went into the house; and he, the defendant, drove off. He then stated that he returned to the house and found the police officer there, and was arrested; and that he did not know at that time why he was arrested. Asked who the other man was, the defendant said that his name was "Mike."

On the same evening Timmons told the nurse who met him at the hospital where he took Mrs. Lewis, that "I shot her accidentally. I shot two of them," and told Police Officer H. D. Suggs that: "The

gun went off, it was an accident, the gun went off four times." Later asked what happened, he replied: "I am trying to do a favor for someone, and I am not saying any more." While in jail he wrote to his sister saying: "I know that I have done wrong, and I am going to fight until I die."

The defendant did not take the witness stand. The record shows that he knew both Mrs. Lewis and Mrs. Bannon. All three were natives of Maryland, and Timmons had, in his younger years, gone to the same school in Berlin, Maryland, then attended by the two women. Mrs. Lewis had seen Timmons only about three times in the ten years preceding October, 1961. Timmons, twenty-four years of age, stopped school at the age of sixteen, and obtained employment with a racing establishment in Maryland. There is evidence that he had suffered from "a nervous condition" for which his physician had had him committed to a Maryland state mental hospital on June 20, 1959. He was allowed to return home in August, 1959; but was readmitted to the hospital in November of the same year. On December 23, 1959, he was paroled in the custody of his mother, and in April, 1960, he obtained a discharge from the hospital, and thereafter came to Virginia Beach and obtained employment with the parents of Ann Bannon, Mr. and Mrs. Ayers, the latter owning or operating the Virginia Lee Hotel at Virginia Beach.

On October 20, Timmons was admitted to the Norfolk General Hospital for observation as to his mental condition and treated for an overdose of sleeping pills. On October 25, 1961, he was ordered by the trial court to be delivered to the Superintendent of the Southwestern State Hospital at Marion, Virginia, for proper care and observation, and for a detailed report of his mental condition as of October 19, 1961, and all other days subsequent thereto, pursuant to Section 19.1-228, Code of Virginia, Rep. Vol. 1960.

The Superintendent of the Southwestern State Hospital and Dr. Charles Nemeth, its clinical director, reported to the court that Timmons was "considered to be mentally competent and able to testify in his own defense." They further stated that they found nothing in the history of his behavior in jail from October 28, 1961, "indicating the presence of any psychosis," and in their opinion, Timmons, "was during this whole period, without psychosis and was mentally competent" to stand trial.

On February 1, 1962, at the request of the defendant the court appointed William H. Sands, "a competent and experienced attorney"

as counsel for the defendant. On February 6, 1962, four other indictments were found against Timmons: one for malicious shooting with intent to maim, disfigure, disable and kill Ruth Lewis; two for committing rape on Ruth Lewis; and one for committing rape upon Ann Bannon.

The trial of this case was continued from time to time upon motion of the defendant, and was held on April 17 and 18, 1962. The court gave eight instructions to the jury at the request of the Commonwealth and twelve instructions at the request of the defendant. Eight of the instructions granted on behalf of the defendant related to the issue of his sanity. Another told the jury that should the defendant be found guilty, his punishment "must be based solely upon the killing for which he is being tried without considering other alleged offenses." Defendant objected to only two of the Commonwealth's instructions, C-3, which told the jury that murder in the commission of, or attempt to commit rape is murder of the first degree, and Instruction C-4, which defined the offense of rape. No grounds were assigned for either objection, nor exceptions taken to the granting of the instructions.

The record shows that counsel appointed by the court to represent defendant vigorously stressed before the jury the actions of Timmons at the home of Mrs. Bannon to support the theory that defendant was insane at the time of the killing. No objection was made to the details recited by Mrs. Lewis; and, on the other hand, she was cross-examined at great length as to them. There was no objection made to any of the other evidence, except as to the admission of the photographs showing the body of Mrs. Bannon. Defendant's counsel sought in his cross-examination of the witnesses to bring out the enormity of the shocking nature of the acts of the defendant. In his argument to the jury, he referred to them as showing "a most unusual situation, a most abnormal situation, not a situation that you or I have any right to expect from any normal human being." He said they disclosed "a picture of a mad dog running wild," and "(T)hat is exactly what it was and the Commonwealth's Attorney himself brought it out to you." He asked that Timmons be found not guilty by reason of insanity; but if the jury did not believe him to be insane, under the instructions of the court, that a death sentence be not imposed upon him, but he be sent to a hospital or penitentiary for treatment.

The motion, in the trial court, for a new trial was argued by

counsel of defendant's own choosing, his present counsel, who succeeded counsel appointed by the court. Upon appeal, he assigns error: (1) to the verdict of the jury as contrary to the law and the evidence; (2) to the admission of the photographs and "slides" of the body of the deceased; (3) to the admission of evidence relating to the rapes of Mrs. Lewis; (4) to the "failure of the court to properly instruct the jury;" and (5) to "improper argument" of the Commonwealth's Attorney. Error assigned to the exclusion of evidence has been abandoned.

■ The assignments will be considered in the order above mentioned. On the first assignment, it is admitted in the brief of the defendant that the burden was on him to establish to the satisfaction of the jury that he was mentally incompetent at the time of the shooting of Ann Bannon. Counsel, however, recognizes that this question has been resolved against him, and although he asserts that the jury might have reached a different conclusion, he admits that the verdict is binding on him. In view of this admission, it is unnecessary that we further deal with the facts relating to the issue of insanity.

Much of the brief and argument of the defendant is based on his contention that the admission of the photographs of the body of Mrs. Bannon and testimony as to the rapes of Mrs. Lewis tended to inflame the jury to his prejudice, in support of his second and third assignments of error.

The theory of the Commonwealth was that the defendant was guilty of either a willful, deliberate, and premeditated killing, or a killing in the commission of, or attempt to commit rape. Code, § 18.1-21.*

The killing of Mrs. Bannon by the defendant is uncontradicted and the guilty agent is not in question. In view of that there arose the presumption that defendant was guilty of murder of the second degree, and the burden of proving the elements necessary to elevate the crime to murder in the first degree was upon the Commonwealth. *Henry* v. *Commonwealth*, 195 Va. 281, 289, 77 S. E. 2d 863.

The Commonwealth sought to show that the motive under either of its theories was rape. Here, as in the case of *Martin* v. *Commonwealth*, 184 Va. 1009, 37 S. E. 2d 43, the defendant contended that

---

*§ 18.1-21 "Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery or burglary is murder of the first degree. All other murder is murder of the second degree."

since it had been shown that a person had died of a wound inflicted by the discharge of a pistol in the hands of an accused, admission of photographs showing the body of the victim, was surplusage, which inflamed the jury.

In answer to that contention we said in *Martin* v. *Commonwealth*, *supra*, 184 Va., page 1022:

"Objects connected with crime are often offered in evidence in criminal cases when related to issues in the case. An authentic photograph shows no more than would be disclosed by a view of the object itself. It may give a more accurate description of the appearance, nature and condition of the object than a mere verbal description dependent upon memory. The picture of the wounded body of a man in the repose of death should excite no more sympathy or prejudice than the exhibition of a living person with a bruised, broken and torn body.

"The manner in which Martin was shot, the distance from which he was shot, and where the shot entered his body were relevant and material to the issue."

We there further said that: " 'It did not lie in the power of the defendant by this general admission or confession to prevent the state from proving all the facts, and thereby present to the jury the picture of the entire transaction relied on for conviction. Doubtless there are many cases where courts should and do preclude proof upon the admission of essential facts, but rarely where the intent or motive is involved, and may be inferred from such proof. (citations)' " 184 Va., page 1023.

See also *Enoch* v. *Commonwealth*, 141 Va. 411, 437, 438, 126 S. E. 222; *Newberry* v. *Commonwealth*, 191 Va. 445, 61 S. E. 2d 318, and annotation, "Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death," 73 A. L. R. 2d 769, wherein a multitude of cases are reviewed, including the two Virginia cases above cited.

The photographs of the victim were relevant to show the degree of atrociousness of the crime, or the malice with which it was committed. The state of disarray of the deceased's clothes shed light on the motive and intent of the defendant, as revealed in his contemporaneous acts. The photographs clearly and simply show more than any witness, save defendant, actually saw at the time of the killing. The question of their admissibility was one resting in the sound discretion of the trial court. *Enoch* v. *Commonwealth, supra*, 141 Va., page 438.

■ There is no merit in the contention that it was error to permit Mrs. Lewis to testify as to the rapes upon her. There was no exception to her testimony and the vigorous and persistent cross-examination of her shows that the defendant sought to magnify the depravity and brutality of his acts to give substance to the argument that he was insane. While there has been no compliance with Rule of Court 1:8, it is also clear that defendant by his cross-examination waived his right to object to her testimony, even if he had saved the point. The killing and the rapes all occurred within a few minutes. The offenses were so closely connected and interwoven as to be a continuous series of acts tending to show the intention and motive of the defendant. It is impossible to separate them and get a complete view of the whole case and the reasons therefor. *Compton* v. *Commonwealth*, 190 Va. 48, 55, 55 S. E. 2d 446.

Furthermore, the court expressly instructed the jury that should they find the defendant guilty, that the punishment to be fixed by them "must be based solely on the killing for which he is being tried without considering other alleged offenses."

Generally speaking, it is not proper on the trial of a criminal case to admit testimony of a prior independent crime; but there is an exception to the rule as well established as the rule itself that such testimony is admissible where it shows motive, intent or is related to or connected with or leads up to the offense for which the accused is on trial. *Colvin* v. *Commonwealth*, 147 Va. 663, 669, 670, 137 S. E. 476.

This is not a situation involving a prior offense unrelated to the act for which the defendant was being tried. The rapes upon Ruth Lewis were important links in the chain of evidence. *Day* v. *Commonwealth*, 196 Va. 907, 914, 86 S. E. 2d 23; *Compton* v. *Commonwealth*, 190 Va. 48, 55, 55 S. E. 2d 446; *Huffman* v. *Commonwealth*, 168 Va. 668, 682, 190 S. E. 265; 7 Michie's Jur., Evidence, §§ 47 and 48, pages 389 *et seq.*

Also see *Williams* v. *Commonwealth*, 203 Va. 837, 841, 127 S. E. 2d 423; and *Rees* v. *Commonwealth*, 203 Va. 850, 868, 127 S. E. 2d 406, where many cases dealing with the Virginia rule and its exceptions are reviewed.

There is no merit in the assignment that the court failed to properly instruct the jury. While Instructions C-3 and C-4 were objected to, there were no exceptions taken to either of them, nor do the assignments of error point out, under Rule of Court 1:8, the grounds

of objection or the vice in the instructions. *Harlow v. Commonwealth*, 195 Va. 269, 271, 272, 77 S. E. 2d 851. We find no error in the giving of Instructions C-3 and C-4, since C-3 merely instructs the jury that "murder in the commission· of, or attempt to commit rape is murder of the first degree," and C-4 merely defines what constitutes the crime of rape.

We come next to the assignment that the Commonwealth's Attorney was guilty of improper argument. It is pointed out that the Commonwealth's Attorney made several statements, the general tenor of which related to the depravity and atrociousness of defendant's acts on October 19, 1961, and the probability that he would commit criminal acts in the future, if he should be released from restraint. It is urged that such argument was prejudicial error because calculated to cause the jury to "speculate" as to what might happen after the verdict, and *Jones v. Commonwealth*, 194 Va. 273, 72 S. E. 2d 693 and *Coward v. Commonwealth*, 164 Va. 639, 178 S. E. 797 are cited in support. The facts in the cited cases are unlike those here. There the court,, in response to. a question from a juror as to whether a sentence imposed by them might be thereafter reduced, stated that it was the duty of the jury to fix the punishment within the limits prescribed by law, without consideration as to what might be done thereafter to reduce the measure of that punishment. Here, the Commonwealth's Attorney was not referring to what might happen with respect to changing the measure of punishment imposed upon the defendant; but as to what might happen if the defendant were turned loose on the public, having in mind the propensities attributed to him by Dr. Thrasher, a witness for the defendant, who said that Timmons had such a diseased mind that "the stress of normal living outside may bring out his hostile, aggressive impulses," and also stressed in the argument of his counsel.

There was not a single objection in the trial court to the argument of the Commonwealth's Attorney, nor a motion for a mistrial because of it. Moreover, the remarks were invited and provoked by the argument of counsel for the accused, in support of his theory that the enormity of the offenses supported the plea of insanity. Defendant's counsel may have thought the remarks supported his theory and did not desire to bring them to a stop, or to ask that the jury be instructed to disregard them.

We do not approve of counsel attempting to go outside the evidence; but he has a right to combat the argument of the defend-

ant's counsel and to refer to the evidence and fair inferences from it, as the Commonwealth's Attorney here did, both with respect to the guilt of the accused and a proper measure of punishment. *Jackson* v. *Commonwealth*, 193 Va. 664, 675, 676, 70 S. E. 2d 322; *Hubbard* v. *Commonwealth*, 190 Va. 917, 931, 932, 59 S. E. 2d 102.

The trial judge, in the exercise of his discretion, evidently saw no impropriety in the remarks, and having the opportunity to observe the whole situation and attending circumstances, concluded that defendant had a fair and impartial trial. While the remarks of the Attorney for the Commonwealth were strong and vigorous, they were based on a situation which confronted him, and we do not think there was any transgression sufficient to classify it as an error warranting reversal under the circumstances of this case.

The defendant was represented by able and competent counsel both in the trial court and in this Court. In the trial court, it was sought to show that he was insane, and much of the evidence, as we have seen, was brought out in answer to questions propounded by defendant's counsel, and admitted on that issue. He cannot be allowed to take advantage of his claim in the trial court that evidence of his condition at the time of the killing showed that he was insane, and now on appeal be permitted to successfully contend that the admission of such evidence was erroneous and prejudicial to him. *McMillan* v. *Commonwealth*, 188 Va. 429, 432, 50 S. E. 2d 428; 1 M. J., Appeal and Error; §§ 253 and 254, pages 669 *et seq.;* 5 M. J., Criminal Procedure, § 42, page 373.

After examining all of the assignments of error, the whole case in its trial setting and full context, and taking into consideration the contentions of the defendant during the progress of his trial, we conclude that a reversal of the judgment is not warranted.

The judgment of the trial court is, therefore, affirmed.

*Affirmed.*