# Richmond

SAM WESTRY v. COMMONWEALTH OF VIRGINIA.

October 11, 1965.

Record No. 6027.

Present, All the Justices.

*Edward T. Caton, III* and *Grover C. Wright, Jr. (Caton & Wright* on brief), for the plaintiff in error.

*M. Harris Parker, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

In June, 1964, Sam Westry, defendant, was tried by a jury on an indictment which charged him with the murder of Robert Edward Harmon. He was found guilty of second-degree murder, his punishment was fixed at twenty years in the penitentiary and he was sentenced accordingly. He was granted a writ of error and here contends that the evidence was not sufficient to support the verdict and that prejudicial errors were committed in his trial.

He claimed in the court below that the killing was done not by him but by his companion, Herbert Lee Capps. Capps was the main witness for the Commonwealth, and the substance of the testimony

given by him and other witnesses for the Commonwealth was as follows:

■ Harmon was a sailor stationed at Oceana Naval Air Station, Virginia Beach. He met two girls in Virginia Beach, Ernestine Leigh and Christine Turner, who had adjoining rooms in an apartment where Harmon had visited them earlier in the night of the shooting in October, 1963. He told friends that he planned to go back there to spend the night. He went back later and without knocking entered the room occupied by Ernestine, who was asleep. She was frightened and cried out. At that time, about 11 p.m., Capps was with Christine on her bed in the adjoining room. He got up and went into Ernestine's room, saw Harmon standing by the door and asked him what he was doing there. Harmon replied that the girl knew him and the door was unlocked. Capps then told him he should not have come in the way he did. That seemed to end the matter and when Capps got ready to leave about fifteen minutes later, Harmon asked him if he would take him in his car over to Harmon's base in Oceana, and Capps said he would.

Instead of taking Harmon to Oceana, Capps drove to the home of defendant Westry, whom Capps described as his pal or buddy. Capps was twenty years old and Westry twenty-three. In his statement made afterwards Capps said he went to Westry's house to get Westry to teach Harmon "not to be breaking into people's houses." Christine was Capps' girl friend and Westry was well acquainted with Ernestine.

When they arrived at the home of Westry, Capps went into the house, leaving Harmon in the car, and after a few minutes Harmon sounded the horn two or three times. Westry inquired who was in the car and Capps told him who it was and what had happened at the apartment, whereupon Westry proposed that they go out and teach Harmon a lesson. Westry put on his coat, took his gun out and told Capps to hold it for him. They went out to the car, Capps told Harmon to get out of the car and they had a few words, whereupon Westry jumped in and "took it over," saying, "He is supposed to be a wise guy." He snatched the gun out of Capps' hand and he and Harmon began arguing, then before Capps could do anything Westry shot twice. The first struck the chrome on the car door, and the second hit Harmon in his chest as he was standing beside the car. As Harmon staggered into the road, Westry struck him over the head twice with the pistol and broke the barrel. Capps testified that Westry arranged the whole thing.

Westry then placed Harmon's body in Capps' car and took it to a wooded area. Coming back he met Capps, who was walking toward his home; Capps got into the car and Westry drove it back to Westry's house. They both then walked or ran to where Westry had left the body and dragged it into some bushes. On the way back Westry threw the pistol into a pool of water, from which it was afterwards recovered.

These events occurred before daybreak on Sunday, and about dark that evening Westry and Capps drove back with shovels, dug a hole and buried the body. They attempted to cover their tracks but a hand of Harmon was left protruding from the grave where the body was discovered some four months later.

A few weeks after the discovery of the body, and on information furnished by Capps, Westry was arrested and charged with the killing. He denied knowing Harmon or knowing anything about his murder, but afterwards admitted that he had been a party to his death and made a written statement which was introduced in evidence by his attorney whom he had employed.

Westry testified at his trial and was his only witness. The substance of both his testimony and his statement was that on the night in question Capps drove into his yard and came into the room where he was in bed. He asked Capps what the trouble was and Capps replied that it was just a little problem he could solve and said, " 'Give me the pistol,' and I gave him the gun." Westry then put on his pants and shoes and went out. There was an argument going on "between this fellow and Capps" and some bad words between them. Harmon was coming up toward Capps and Westry reached for Capps' arm, saying to him, "don't do it," and the gun went off. Harmon grabbed his chest, spun away from the car and into the ditch. Westry ran to him and shook him but he did not say anything and was limber. He, Westry, then said, "Lord, Herb, you shot this man," grabbed the gun from him and said, "Come on, let's get him out of my yard before somebody come along and see him here." He recounted the things done by him and Capps to dispose of the body about as above described, and he admitted taking a watch and a ten-dollar bill from the deceased.

He was asked why he did not tell a neighbor or somebody what had happened and get the police there. He replied, "Well, because I had been convicted down here once and I didn't want to be sent back to pull time. So before I knew it, I was all deep involved into it, a part

in it, and I was just afraid. Didn't even think." He stated that he had previously been convicted of a felony and sent to the penitentiary.

The jury weighed the evidence, resolved the conflicts and divided the true from the false. The question as to who was the immediate perpetrator of the crime and fired the shot that killed Harmon was theirs to decide and their verdict was supported by the evidence.

The defendant contends that nevertheless his conviction should be reversed for the following alleged errors in his trial:

■ The refusal of his motions to make available to the defendant all statements made by the defendant and by Capps, a list of the Commonwealth's witnesses and their "reports" as to "events and activities" in connection with the case; to take discovery depositions of two police officers; and for a bill of particulars stating whether defendant was to be tried as perpetrator or as an aider and abettor.

In response to his motions the court ordered the Commonwealth to furnish the statement made by the defendant and a bill of particulars stating the Commonwealth's theory as to whether the defendant perpetrated the offense charged or acted as an accomplice. The Commonwealth complied and the court overruled the other motions. There was no error in these rulings.

■ We have no statute or rule or practice in Virginia permitting the taking of depositions in a criminal case except the deposition of a victim of rape. Code § 18.1-47. In *Setliff* v. *Commonwealth*, 162 Va. 805, 811, 173 S.E. 517, 519, we held:

"While depositions have been used in chancery proceedings since early times, their use as evidence in criminal cases, or in civil suits at law was unknown to the common law. The right to take depositions in other than equity cases can, therefore, be conferred only by statute, which must be clear, and its requirements fully complied with before such evidence can be received." See 17 Am. Jur., Discovery and Inspection, § 32, p. 36.

■ There is no showing of prejudice to the defendant in the court's refusal to require the Commonwealth to present to the defendant a list of witnesses and their reports "touching events and activities in connection with this case." Several weeks before the trial the defendant made his written statement of his version of the parts played by him and Capps in the killing. There is no complaint by the defendant that his counsel was not at liberty to talk to Capps and any other witness for the Commonwealth at any time prior to

the trial. The evidence given by the witnesses other than Capps was on undisputed points. The court's refusal to grant the blanket request of the defendant was not harmful to the defendant and was not error. *Abdell* v. *Commonwealth*, 173 Va. 458, 2 S.E. 2d 293; 21 Am. Jur. 2d Criminal Law, § 328, p. 354 and § 331, p. 358.

(2) The admission of photographs of the body of deceased taken after its discovery.

█ Defendant concedes that the admission of such evidence is in the sound discretion of the court, *Timmons* v. *Commonwealth*, 204 Va. 205, 129 S.E. 2d 697; Anno., 73 A.L.R. 2d 769, 780. Defendant's contention is that these photographs were not relevant or material and tended only to inflame the jury. There is nothing to indicate that they had that effect. "The picture of the wounded body of a man in the repose of death should excite no more sympathy or prejudice than the exhibition of a living person with a bruised, broken and torn body." *Martin* v. *Commonwealth*, 184 Va. 1009, 1022, 37 S.E. 2d 43, 49. The photographs here afforded some corroboration of the medical testimony and of the testimony of Capps, and as was said of those admitted in *Timmons* v. *Commonwealth*, *supra*, they were admissible "to show the degree of atrociousness of the crime, or the malice with which it was committed." 204 Va. at 214, 129 S.E.2d at 703. See Anno., 73 A.L.R.2d at p. 831.

(3) Refusing to allow defendant's counsel to read to the jury the bill of particulars in its entirety.

█ The indictment was in the statutory form for murder. Code § 19.1-166. The bill of particulars, filed in response to defendant's motion, simply stated as above indicated that the defendant was present at the time the offense was committed and was the perpetrator of the offense. It was only a written statement by the Commonwealth's attorney as to what he expected to prove. It was not evidence, reading it to the jury would have served no proper purpose and it was properly forbidden.

(4) Giving at the request of the Commonwealth Instructions 5, 7 and 9.

Instruction 5 told the jury that it might consider defendant's prior conviction of a felony as affecting his credibility but not as evidence of his guilt. It was permitted by Code § 19.1-265 and the evidence on which it was based was first volunteered by the defendant.

█ Instruction 7 told the jury that if Capps and defendant "agreed, planned or designed" to do bodily harm to Harmon, and

while engaged in carrying out such plan one of them shot and killed Harmon, and that such shooting should have been contemplated as a probable result of the common design, they were equally guilty.

"Every person who is present lending countenance, aiding or abetting another in the commission of an offense is liable to the same punishment as if he had actually committed the offense. * *"

"If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime. * *" *Spradlin* v. *Commonwealth*, 195 Va. 523, 527, 528, 79 S.E.2d 443, 445.

The evidence was that Capps took Harmon by Westry's house to get Westry to teach him a lesson. When Harmon sounded the horn several times Westry proposed that they go out and perform that mission. They did so and Harmon was killed by the use of the pistol furnished by Westry.

Instruction 7 correctly stated the legal principle involved, was warranted by the evidence and no error occurred in giving it.

Instruction 9 undertook to explain what constituted reasonable doubt. It was neither helpful nor harmful, but not reversible error. *Strawderman* v. *Commonwealth*, 200 Va. 855, 108 S.E.2d 376.

█ (5) Refusing defendant's offered Instructions C, C-1, E-1, E-2, H-1 and H-2.

Instruction C as offered stated that if two persons had the same opportunity to commit the offense and there was a reasonable doubt about who did it, the jury should find the defendant not guilty. Defendant's complaint is that the court added "unless * * the two were engaged together in carrying out a design * * as set forth in Instruction No. 7." The addition was properly made.

C-1 was on reasonable doubt and the court properly refused it on the ground that it was repetitious of Instruction A on the same subject given for the defendant. *Thomas* v. *Commonwealth*, 183 Va. 501, 507, 32 S.E.2d 711, 713.

E-1 would have told the jury that the absence of motive when there was reasonable doubt as to who committed the offense affords a strong presumption of innocence. The court gave Instruction G, which told the jury that it was not necessary for the Commonwealth to prove motive, but its presence or absence should be considered

as bearing on defendant's guilt or innocence. It was a more accurate statement of the law than E-1 and was sufficient on the subject.

Defendant argues that E-2 or H-1 should have been given to the effect that if the defendant and Capps acted independently of each other, only the one who did the killing could be convicted, and if there was a reasonable doubt as to which one did it the defendant must be acquitted. They were both properly refused because not warranted by the evidence and they omitted the element of joint design set forth in Instruction C.

H-2 defined accessory after the fact and would have told the jury that if Capps shot Harmon and defendant knew it, and thereafter assisted in removing and burying the body, they must find the defendant guilty as an accessory after the fact. It was a peremptory instruction based on only a part of the evidence. Defendant admitted that he did these things, but they were done after the killing, and the instruction left entirely out of view what the defendant had done or shared in doing before these subsequent things occurred.

The court gave in all seventeen instructions, nine on motion of the Commonwealth and eight on motion of the defendant. They fully and fairly explained to the jury the principles of law applicable to the issues in the case and we find no error with respect to those refused.

(6) Defendant next complains because the court overruled his objection to a statement by the Commonwealth's attorney in his argument to the jury that when Capps drove around to Westry's house Capps "knew Westry and he knew the type of man Westry was, too." Westry had stated, as referred to above, that he did not tell anybody about the killing because he had been in the penitentiary and did not want to be sent back "to pull time." In overruling defendant's objection the court instructed the jury that counsel were allowed to argue as to conclusions which they thought the jury might draw from the evidence, but that their argument was not evidence and the jury must draw its own conclusions from the evidence. No error occurred in this incident.

(7) Finally, defendant claims the court should have granted his motion for a mistrial made when the defendant was on the witness stand in his own behalf and was being cross-examined as to his written statement which he had put in evidence about his connection with the killing. He was asked what other things he talked to the officer about and he replied, "He talked to me about some more cases." He

was then asked, "What did you tell him?" His counsel objected and the court sustained the objection. Defendant argues that it was apparent to the jury that this refered to some other charges then pending against defendant which had no place in this trial. That conclusion is only a supposition, and in any event it derives from a statement by the defendant which affords no sufficient ground for declaring a mistrial.

For the reasons stated the judgment appealed from is

*Affirmed.*