**Jay R. TIMMONS, Appellant,**

**v.**

**C. C. PEYTON, Superintendent of the Virginia State Penitentiary, Appellee.**

**No. 10042.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 5, 1966.

Decided April 29, 1966.

---

Daniel Hartnett, Accomac, Va. (court-assigned counsel) [Ayres & Hartnett, Accomac, Va., on brief] for appellant.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, and James Parker Jones, Asst. Atty. Gen. of Virginia, on brief), for appellee.

Ronald P. Sokol, Charlottesville, Va., amicus curiae.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge:

Jay Timmons was convicted by a jury of first degree murder in April 1962. He was sentenced to die. The Supreme Court of Appeals of Virginia affirmed the judgment of conviction. Timmons v. Commonwealth, 204 Va. 205 129 S.E.2d 697 (1963). Habeas corpus was sought in the state courts; a hearing was held, and in July 1963 relief was denied. The Virginia Supreme Court of Appeals denied a writ of error, and the Supreme Court denied certiorari. Timmons v. Cunningham, 375 U.S. 994, 84 S.Ct. 635, 11 L.Ed.2d 480 (1964). Habeas corpus was then sought in the court below; the facts were stipulated by counsel, and on April 28, 1965, the district court dismissed the petition but granted a certificate of probable cause. Timmons v. Peyton (D.C.E.D.Va.), 240 F.Supp. 749.

The facts of this case are the following: On October 19, 1961, at about 5:20 p. m. Jay Timmons shot two women. One of them was killed; the other was shot through both legs and through the neck. Timmons and the women had attended grade school together in a small town in Maryland. Timmons was employed by the father of the deceased victim. He had apparently come to the house in order to persuade her to give him a contract to paint her house. There is no indication in the record of any recent social relationship between Timmons and either of the two women. Ap-

parently, he had not seen either of them other than on two or three occasions since childhood. When the surviving witness entered the house, the other woman sat at her desk writing. Timmons entered the living room and greeted the newcomer quite casually. This was the only remark made before the shooting began. After shooting them Timmons proceeded to have sexual intercourse with the one who was still alive. It is possible that he also had intercourse with the dead woman. He then telephoned the police and told them he had shot two women. Discovering that one of them was alive, he picked her up in his arms, took her to a car, and drove her to the hospital. He then returned to the residence where the events had taken place; the police were already there. This was about 5:35 p. m.

The police took Timmons to headquarters. En route he said it was an accident; a little later he said he would say no more. Shortly thereafter Timmons was rushed to the hospital because he was getting drowsy and told the police he had taken sleeping pills; his stomach was pumped and revealed that he had in fact taken pills containing Scopalamine and Methapyrilene. Timmons remained in the hospital overnight and was returned the next day to police custody. At that time Timmons made a written statement to the police which described fully the sequence of events; this written statement was later introduced into evidence at trial and read aloud to the jury. The court below found that the record was " * * * silent as to whether either of the two detectives said anything to petitioner as to any right to counsel, or otherwise warned him that anything said by him could be used against him. We presume that nothing was said along these lines."

At trial Timmons pleaded not guilty by reason of insanity. Defense counsel permitted without objection the written confession to be introduced into evidence along with slides of the two women after they had been shot. Counsel did object, without success, to showing photographs of the victims to the jury and, also without success, to enlarging the slides and projecting them for the jury on the ground that these were prejudicially inflammatory and not necessary to prove the state's case.[1]

Timmons was born in 1936, dropped out of school when he was sixteen, and had a nervous breakdown when he was twenty-three, two years before the events in question. At that time he shot himself and was then sent to a state mental institution in Maryland. He remained there two weeks, returned home for about three and a half months, and then went back in for about another month. His history at that institution revealed that he was "potentially dangerous." At trial defense counsel called the docter who examined Timmons on the morning after the events in question. He testified that Timmons did not appear to him at that time psychotic. Defense counsel had never discussed the case with this witness. The witness, although he refused to express an opinion as to legal sanity, did testify that Timmons "was in reasonably good mental shape, not to require further psychiatric treatment. * * *" before being returned to police custody.

The chief witness for the defense was a well known and respected Norfolk physician who was a diplomated psychiatrist. He testified that he had made a thorough investigation and that in his opinion Timmons was psychotic when he committed the crime and had a history of four suicide attempts.[2] Defense counsel did

1. The prosecution argued to the jury that the accused man was a mad killer—that if his life were spared he would kill again and again; that he might be a little crazy but he knew the difference between right and wrong.

2. The first defense pyschiatrist diagnosed Timmons as "schizophrenic reaction un-

differentiated type; catatonic." The second psychiatrist as "schizophrenic reaction chronic undifferentiated type." No explanation is offered to explain why counsel called the first psychiatrist without previously discussing the case. Presumably he had seen the doctor's diagnosis and assumed from that that he would tes-

not contact the physician who had originally put Timmons in a state institution in Maryland because he had moved and counsel did not have his address, and also because that doctor was not a psychiatrist. Subsequently different counsel located the doctor and received a letter from him stating that "Mr. Timmons was definitely insane while under my care." Two psychiatrists testified for the state. The official diagnosis by the two state psychiatrists, who had examined Timmons at the Southwestern State Hospital, was "a social disturbance, in addition, alcoholism, and also mild mental deficiency." These two psychiatrists estimated that Timmons had received about eight hours of individual attention by the doctors during his two months at the hospital. Dr. Blalock, the superintendent of the asylum, one of the state's witnesses, testified that he had not examined Timmons personally except at the staff meeting when the diagnosis was made. He conceded that his institution was very much understaffed; that Timmons was one of two hundred maximum security patients under the direct supervision of Dr. Nemeth, the other expert witness for the state. He stated that in his opinion Timmons knew the difference between right and wrong and had the power to choose the right at the time he committed the offense.

◾ Timmons' contentions before this court may be reduced to two basic arguments: (1) that his Fourteenth Amendment right to due process was violated in that he was denied the right to counsel at critical stages in his pretrial procedure, and (2) ineffectual counsel. Both the state habeas court and the district court found that his representation at trial was competent, and we cannot say that this finding was clearly erroneous.

We think that the denial of counsel to the petitioner for a period of three and one-half months following the offense, during the first 60 days of which time

the state for all practical purposes held him incommunicado, was a violation of the petitioner's Sixth Amendment right to counsel during critical pretrial proceedings which materially affected the outcome of his trial. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963). In considering this question, we must keep in mind the following chronology of events: The killing occurred on October 19, 1961. The confession was taken by the police on October 20, 1961. On October 24, 1961, the petitioner was served with notice of the motion to have him committed to Southwestern Hospital, a state institution for the criminally insane. On October 25, 1961, the commitment order was signed. On December 20, 1961, Dr. Blalock, the superintendent of Southwestern Hospital, reported that the petitioner was competent to stand trial. On December 27th Dr. Blalock further reported that in his opinion the petitioner was sane at the time of the commission of the offense, pointing out that he had overlooked this request in the order when his original report was made. On January 20, 1962, the petitioner, on advice of the police, waived a preliminary hearing. On February 1, 1962, counsel was appointed. On February 5, 1962, an indictment was returned by the grand jury.

◾ We hold that the preparation of the defense may not without violation of due process be postponed indefinitely until the state has completed its case. We do not hold that an accused is entitled to have a lawyer present when he is undergoing psychiatric tests to determine his competency to stand trial or his sanity. That is not the question here where this petitioner was held by the authorities for sixty-one days—during which he received a maximum of only eight hours personal attention. We think the preparation of his defense could and

---

tify to insanity. We think it a fair inference from the record that the doctor's unfavorable testimony applied to Timmons' appearance the day he left the hospital and that he refused to give an opinion on legal sanity because he had no opportunity to make an adequate examination.

should have been allowed to proceed concurrently with the state's. Furthermore, there is no reason to assume that reputable counsel and psychiatrists could not cooperate in the administration of tests and the necessary factual investigations of the patient's background to verify or refute his own statements.

On October 24, 1961, while defendant was confined in the city jail, notice of hearing to determine whether he should be committed to the state insane asylum was served on him. The commitment was made on motion of the state's attorney requesting that he be examined not only to determine if he was competent to stand trial as required by statute (Virginia Code of 1950, § 19.1–228) but also to determine if the defendant was sane at the time of committing the offenses for which he had been arrested. The statute does not authorize the latter determination. The defendant, who was indigent and mentally deficient, was neither present at the hearing nor represented by counsel. The next day he was sent to the state asylum where he remained for two months.

█ First, we note that the petitioner himself was not present at the hearing.[3] This court has heretofore held that the Virginia statute (§ 19.1–240) requiring the presence of the accused at every stage of his trial is merely declaratory of a common law right, and his absence at any critical stage a violation of his constitutional right. Near v. Cunningham, 313 F.2d 929 (1963). In 1964 the Virginia legislature passed § 19.1–241.1 guaranteeing every person accused of a felony the right to representation by counsel at every stage of any proceeding against him based upon such a charge "held in any court in this State." We disagree with the district court's opinion that this statute granted new rights to an accused not already embodied in the

Sixth Amendment to the Constitution and by the Fourteenth Amendment made applicable to the states. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).[4] We think the argument that the presence of a defendant at a civil commitment is not required presumably because the proceeding might confuse and harm the defendant, is not pertinent in this case, especially in view of the fact that the DePaul Hospital at Norfolk, where the defendant had been sent for a preliminary examination, had returned him to police custody with the report that he was in reasonably good mental shape and did not require further psychiatric treatment before being released to police custody. Furthermore, in a civil case the defendant is entitled by statute to have counsel present during the hearing to defend his rights. Counsel here could have pointed out to the court that the Virginia statute did not authorize the petitioner's commitment to test his sanity at the time of the offense but only to test his capacity to stand trial. One does not have to be a medical expert to know that the more closely to the time of the offense an examination of an accused's mental condition can be made the more trustworthy the report. Thus in this case, wherein it was obvious to the state from the very outset that the only possible defense was insanity, the petitioner was held in official custody for more than three and one-half months until the state had completed all aspects of its evidence and preparation for trial before petitioner was permitted the benefit of counsel.

Lending strength to the petitioner's contention that his defense was crippled and due process denied by this delay is the fact that the trial court denied a motion to make available the records at the state asylum in order to permit defense's expert psychiatric witness to examine

3. The petitioner has testified that he continuously asked for counsel from the time of his arrest. This testimony was contradicted in some instances. Even when it stands uncontradicted the state habeas court refused to credit it. Had the petitioner been present, request for counsel might have been honored.

4. The statute (Virginia Code of 1950 § 19.1–228) provides for the examination of a person "charged with crime", thus manifesting in its context that it is a part of the accusatory process and thus under *Gideon* counsel is then necessary.

them. Thus defense was unable to prepare any cross-examination of the state's experts with the aid of his own experts. The state's experts admitted on cross-examination serious shortages of professional and investigatory staff. In spite of an effort on the part of defense counsel, the record reveals no adequate cross-examination of the state's expert witnesses, notwithstanding the glaring discrepancy between the diagnosis of the defense's experts and that of the state's. Certainly, a jury of layman in search of the truth as to the petitioner's mental status is entitled to more than the naked confrontation of two such diverse diagnoses.

■ We think, finally, that the strongest reason supporting our holding that the defendant was denied due process by being delayed for over three and one-half months in the preparation of his defense while the state was actively seeking evidence to convict, is the fact that under Virginia law the burden of proof rests upon a defendant who pleads insanity. Indeed we feel that this case is a classic example of the prejudice which is caused by this rule. Given the sickening and appalling nature of the facts of Timmons' crime, his mental history, his low mentality,[5] and the strong testimony of a psychiatrist that he was insane, there is little doubt that a jury would have found that a reasonable doubt existed as to his sanity. Due to concessions made in the brief on direct appeal this issue was not before the Supreme Court of Appeals of Virginia. It is regrettable that that court did not have an opportunity to review its holding on this point. The Virginia rule was first laid down in *Boswell's* case, Boswell v. Commonwealth, 61 Va. (20 Gratt.) 860, 874–876 (1871), and was reiterated in Christian v. Commonwealth, 202 Va. 311, 117 S.E.2d 72 (1960), and Jones v. Commonwealth, 202 Va. 236, 117

S.E.2d 67 (1960). We recognize the fact that the Supreme Court in 1952 in the case of Leland v. State of Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302, has upheld an Oregon rule requiring the defendant to prove insanity beyond a reasonable doubt. We feel bound by this decision, although we seriously doubt if it would be upheld by the present court.

■■ The district court has discredited the petitioner's assertions that he requested counsel on two occasions before his trial: first, when he was questioned and confessed at the police station the day following the offense, and second while he was confined at Southwestern for sixty-one days. Finally, the court found that he had "probably requested counsel" the day before his preliminary hearing on January 20, 1962. The court considered each of these instances separately and concluded that even had he requested counsel, no harm was done by denial. Without considering the application of *Escobedo* [Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977] to the confession, we cannot agree with the habeas court's conclusion. We think that the cumulative effect of the state's conduct constituted a denial of the petitioner's Fourteenth amendment right to due process and his Sixth Amendment right to counsel under the rationale of the Court's decision in Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958). In *Crooker* the special circumstances did not exist which would have caused the Court to set aside the judgment. Here we are dealing with a defendant of near moronic capacity who had twice been confined in an institution for the feeble-minded, whose heinous crime with no apparent motive leaves one with the conviction that the petitioner is not a proper subject for execution. We cannot agree with the district court, which "expresses no independent view

5. The state psychologist who administered the Wechsler Adult Intelligence Scale Form test reported Timmons' I.Q. score as: Verbal score 74, Performance score 69, and full score 70. In lay language Timmons was of extremely low intelligence bordering on mental retardation. He would be considered barely able to function outside of a specialized institution—not educable in an ordinary school, and rated in the lowest 2½% of the population.

as to the sanity of the petitioner" that the moral question of executing a person of petitioner's mentality is for the executive branch. When the state has marshalled all its forces against such creatures as the petitioner and has convicted a man who is in law insane by denying him a fair opportunity to carry his very heavy burden of proof, he has been denied "due process" under the Fourteenth Amendment. In the elequent dissenting words of Mr. Justice Frankfurter in Leland v. State of Oregon, 343 U.S. 790, 72 S.Ct. 1002 (1951):

> "But a muscular contraction resulting in a homicide does not constitute murder. Even though a person be the immediate occasion of another's death, he is not a deodand to be forfeited like a thing in the medieval law. Behind a muscular contraction resulting in another's death there must be culpability to turn homicide into murder."

We, therefore, reverse the district court and remand with instructions to issue the writ unless the state will retry him within a reasonable time, affording him a fair opportunity to test the issue of sanity at the time of the offense.

Reversed and remanded.