## Richmond

### Earl Clanton, Jr.

v.

### Commonwealth of Virginia

January 22, 1982.

Record No. 810953.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

42

Timothy J. Hauler (Elliott, DeBoer & Hauler, Ltd., on brief), for appellant.

Thomas D. Bagwell, Assistant Attorney General (Marshall Coleman, Attorney General, on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Tried by a jury on an indictment charging him with capital murder in the commission of robbery while armed with a deadly weapon in violation of Code § 18.2-31(d), the defendant, Earl Clanton, Jr., was found guilty as charged. In the second stage of the proceeding conducted in compliance with Code §§ 19.2-264.3 and -264.4, the same jury fixed Clanton's punishment at death. After considering the report of the probation officer required by Code § 19.2-264.5, the trial court sentenced Clanton to death in accordance with the jury verdict.

We have consolidated our automatic review of his sentence, mandated by Code § 17-110.1A, with Clanton's appeal of his conviction, as authorized by Code § 17-110.1F, and pursuant to the provisions of Code § 17-110.2 we have given them priority on our docket. Clanton seeks a reversal of his conviction and remand of the case for a new trial, or in the alternative commutation of his death sentence to imprisonment for life.

The victim, Wilhelmina Smith, resided in an apartment complex. On November 16, 1980, about 12:30 p.m., police officers, notified of suspicious noises coming from her apartment, entered

and found Smith dead on the bedroom floor, with cuts on her throat and a belt tightly drawn around her neck. They also found Clanton hiding under the bed in another room.

At trial, the Commonwealth presented the testimony of two of Smith's neighbors, the testimony of the investigating officers, physical and scientific evidence, and photographs.

Vanessa Harris, a resident in the apartment directly beneath Smith's, testified that about 12:30 p.m. on November 16 she saw Smith's car drive up and heard Smith walk up the outside stairway to her apartment and say, "What have I done to you?" Harris said that Smith "started screaming" and a "lot of noise" came from her living room. Harris telephoned her grandmother twice, then the police, and then her mother. While Harris was on the telephone she heard noise coming from the back bedroom of the Smith apartment. After making her telephone calls, she looked and listened but before the police arrived she did not see or hear anyone go up or come down the stairway that Smith had used.

Willie L. Acox also lived in an apartment on the floor below the Smith apartment. He testified that about 12:30 p.m. on the day she was killed he saw Smith leave her car and walk upstairs. When she reached the top of the steps, Acox said, she "mumbled something like 'what have I ever done to you? Why this?'" Acox heard Smith's door slammed shut, after which Smith screamed twice. He opened his door and looked out but saw or heard no one on the stairway before the police arrived, and heard no doors open or close upstairs.

Patrol Officer Gary J. Chandler, of the Petersburg Bureau of Police, testified that he was operating his car near the apartment complex when he received a radio call about 12:30 p.m. on November 16 to proceed to that address. With Officer Michael Hess, he arrived within thirty or forty seconds. Finding the door to the apartment across the breezeway from Smith's apartment ajar, the officers entered but found no one inside. After calling police headquarters and receiving instructions to investigate the Smith apartment, they knocked repeatedly on the door and identified themselves as police officers. A woman inside the apartment called to them that she was in the shower and would take a few minutes to get dressed, but the officers continued to knock until the woman unlocked the door and admitted them. She was Natalie Lawrence, who lived in the apartment the officers had just left.

Chandler observed blood on a chair in the living room. Leaving Hess in charge of Lawrence, he walked through the apartment and found Smith lying dead on the floor in the back bedroom, with "an excessive amount of blood on her," a "cord-like" [belt] around her throat, and cuts on her throat. Radioing for additional help, Chandler searched the premises; in another bedroom he discovered Clanton hiding under the bed and arrested him. Clanton had a nylon stocking over his hair and was bare to the waist, but he held in his hands his bloody shirt, which he left under the bed. His torso and hands, and the jeans, tennis shoes, and socks that he was wearing also were bloody. Searching Clanton, Chandler seized a blood-stained wad of money, subsequently determined to be one five-dollar bill and three one-dollar bills, discovered in a pocket of the suspect's jeans. According to Chandler, there were a few marks on Clanton but he was not bleeding; there was no blood on Lawrence or on her clothes.

Hess corroborated Chandler's testimony and further testified that there was blood throughout the Smith apartment. Another officer testified that Clanton's fingerprint matched a bloody fingerprint on Smith's checkbook lying near her body.

Dr. Marcella Fierro, Deputy Chief Medical Examiner, gave the cause of Smith's death as strangulation caused by the ligature that was "wound tightly about her neck." Dr. Fierro also testified that Smith had on her face, in addition to bruises, cutting or stab wounds not more than one-half inch deep which did not penetrate any vital structures. Such wounds, Dr. Fierro said, were generally inflicted by someone holding the edge of a blade to a victim whose head was back. She identified and introduced in evidence photographs of Smith's body, showing the ligature, the bruises and the knife wounds.

A forensic scientist testified that the blood on Clanton's clothes and on objects in the Smith apartment was consistent with Smith's blood type and not Clanton's. The smeared stains on the money found in Clanton's pocket were inconclusive; they were consistent with either Smith's or Clanton's blood type.

Clanton, testifying in his own defense, denied any responsibility for Smith's murder. He asserted that he and Lawrence were in Lawrence's apartment when they heard screams coming from Smith's apartment. At the insistence of Lawrence, he entered that apartment, where he was attacked by a man with whom he struggled until the attacker ran out the door and disappeared.

Clanton said that he found Smith lying on the floor with a knife sticking in her throat. As he was bending over to assist her, he was attacked by another intruder. Clanton was covered with blood from Smith's wounds. Because he was versed in the martial arts, such as jujitsu and karate, he was able to drive off his assailant with blows and kicks. Clanton said that he was also experienced in defending himself because he "boxed light heavyweight for a while" and could box "very well." Clanton gave a graphic and detailed description of the struggle, during which he said his handprints appeared on the wall when he pushed off "to throw a kick" at his adversary. Clanton maintained that he was merely attempting to defend himself, that he did so effectively, that he could have apprehended the intruders but did not because that was not his "job" and he just wanted to protect his own life. The second man fled, according to Clanton, as Lawrence entered the apartment. Clanton looked through Smith's papers for an address of a relative to call; he recalled picking up her checkbook, thinking it might be an address book. When the police knocked on the door, he hid under a bed because he was a fugitive.

Lawrence testified in substantial corroboration of Clanton's testimony. She testified that Clanton was living with her at the time the crime was committed. She said she heard a scream in Smith's apartment, went to investigate, and found the key in Smith's door. Pushing the door open, she saw blood on a chair and heard noise in the apartment. She returned to her apartment and sent Clanton to help. Lawrence said she saw through the peephole in her door one of Clanton's unknown assailants run from the Smith apartment and escape by jumping over the railing of the stairwell. She was on her way into the Smith apartment when the second intruder ran out, pursued by Clanton.

Lawrence retracted a statement she had made to the police two days after the murder, and later repeated, that Clanton had told her before he left her apartment that he was going to "choke" Smith and rob her of her money. Lawrence explained that she made the statement because the police were harassing her and threatening to take her child from her. She acknowledged that when the police arrived at the Smith apartment she delayed opening the door, told Clanton to hide, and falsely informed the officers that she was alone.

In rebuttal, the Commonwealth presented evidence that Lawrence had not been harassed by the police when she made the

statement incriminating Clanton, that she repeated the statement in the presence of her attorney, and that during her incarceration she had written a letter to three of the police officers thanking them for "helping" her to come to her senses, and for all that they "have done and are still trying to do" for her.

The jury found Clanton guilty of capital murder. Clanton's motion to set aside the verdict as contrary to the law and the evidence was denied by the trial court, and the sentencing phase of the bifurcated trial followed promptly. *See* Rule 3A:25A.

The Commonwealth presented evidence that Clanton was convicted of murder in New Jersey in 1972, on a "non vult" plea,[1] and sentenced to prison for twenty-six to twenty-eight years, and convicted in Virginia in 1980 of unlawful injury of one Bruce Brown, for which he was sentenced to prison for four years. Brown, the victim of that crime, appearing as a witness for the Commonwealth, testified that Clanton had beaten him with brass knuckles, thereby inflicting injuries that required him to be hospitalized for five days. He conceded that in this altercation two other men also struck him but he asserted that only Clanton used brass knuckles.

Clanton testified that he was only seventeen at the time of the New Jersey offense, and that he had only acted as lookout during an attempted robbery that ended in murder. He also testified that he had been converted from the Islamic religion to Christianity during his incarceration for the Smith murder; he introduced in evidence certificates showing that he had completed courses in Bible studies.

The jury fixed Clanton's punishment at death. His motion to set aside this verdict as contrary to the law and the evidence was denied by the trial court, which subsequently imposed the sentence of death upon him.

On brief and in oral argument Clanton has relied upon five alleged errors, each of which, he contends, denied him a fair trial and requires that we grant him the relief which he seeks.

## I. *Change of venue or venire.*

Clanton filed a pretrial motion for a change of venue based upon alleged prejudicial publicity. He filed in support of his motion copies of ten articles published in newspapers of general

---

[1] Similar to a plea of nolo contendere. Black's Law Dictionary 955 (Fifth Ed. 1979).

circulation in Petersburg. Clanton alleged that the articles attributed to him responsibility for the criminal activity of November 16, 1980, that they were biased and were written in such manner as to be inflammatory to a jury impaneled to hear the charges against him, and that they caused the citizens of the community to be biased and prejudiced against him. The articles included information about Clanton's previous conviction for unlawful wounding, his escape from custody, Smith's background, and the conviction of Lawrence as an accessory after the fact in the slaying and robbery of Smith.

At the hearing on his motion, Clanton's counsel conceded that he was unable to secure "any affidavits that are normally presented for a change of venue." He asked the trial court, if not inclined to grant the motion, to reserve it for "the possibility of a change of venire" at the time *voir dire* of the prospective jurors was conducted. The court denied the motion but assured counsel that if it appeared upon *voir dire* that an impartial jury could not be impaneled, the court, upon renewal of the motion, would consider it again. Clanton never renewed the motion.

The trial court, after extensively questioning prospective jurors in groups of three, had no difficulty in impaneling a jury. Clanton argues that because only eight of the thirty-five prospective jurors and alternates questioned on *voir dire* had no knowledge of the offenses, it was "inconceivable" that the newspaper publicity had no impact upon their ability to give Clanton a fair trial. Of the twelve potential jurors struck for cause, only three were struck because they had formed opinions as a result of pretrial publicity in the news media. Four were struck because of their views concerning the death penalty, two because of personal relationships, one for business reasons, one because of health problems, and one because of unfitness. The twenty-three who were impaneled assured the court that they had no opinions as to Clanton's guilt or innocence, and would decide the case on the evidence presented in court.

A motion for a change of venue or venire is addressed to the sound discretion of the trial judge, and his action in overruling the motion will not be reversed unless the record affirmatively shows that there has been an abuse of discretion. *Greenfield* v. *Commonwealth,* 214 Va. 710, 716, 204 S.E.2d 414, 419 (1974); *see Linwood Earl Briley* v. *Commonwealth,* 221 Va. 532, 536-38, 273 S.E.2d 48, 51-52 (1980), *cert. denied,* 451 U.S. 1031 (1981).

There is a presumption that an accused can receive a fair trial from the citizens in the locality where the offense occurred, and the burden is on the moving party to overcome this presumption by showing widespread prejudice. *Coppola* v. *Commonwealth,* 220 Va. 243, 248, 257 S.E.2d 797, 801 (1979), *cert. denied,* 444 U.S. 1103 (1980). *See Poindexter* v. *Commonwealth,* 218 Va. 314, 237 S.E.2d 139 (1977). The record fails to show any widespread prejudice in Petersburg against Clanton. Accordingly, we hold that the trial court did not abuse its discretion in denying Clanton's motion for a change of venue or venire.

## II. *Admissibility of photographs.*

The Commonwealth offered in evidence during the guilt phase of the trial ten photographs taken by Dr. Fierro showing the victim's body at the time the autopsy was performed. Clanton objected to the admissibility of the photographs on the ground that they were irrelevant and were intended to prejudice and improperly influence the jury. After examining the photographs, the trial court admitted seven and refused to admit three. Subsequently, the Commonwealth offered three photographs taken by one of the investigating officers showing Smith's body as it was found in her apartment. Over Clanton's objection, the trial court admitted one of these photographs.

Clanton argues that as he offered to stipulate that Smith was murdered by strangulation, the photographs were unnecessary to establish this fact. A defendant, however, may not preclude the Commonwealth from introducing photographs by offering to stipulate facts shown in the photographs. *Timmons* v. *Commonwealth,* 204 Va. 205, 214, 129 S.E.2d 697, 703 (1963).

Clanton concedes that the question of admissibility rests within the sound discretion of the trial court. *Stamper* v. *Commonwealth,* 220 Va. 260, 270, 257 S.E.2d 808, 816 (1979), *cert. denied,* 445 U.S. 972 (1980). He contends, however, that any probative value of the photographs was outweighed by the prejudicial and inflammatory effect upon the jury, so that the trial court abused its discretion in admitting them in evidence. We do not agree.

The Commonwealth had the burden of proving the willful, deliberate, and premeditated killing of Smith during the commission of armed robbery. The trial court, ruling that the photograph of the victim's body in her apartment was admissible to show the

location of her pocketbook, excluded two other photographs depicting the same scene. The photograph was relevant to a determination that Smith was murdered during the commisson of armed robbery. There was no abuse of discretion by the court in admitting the photograph for the specified purpose.

In admitting the seven photographs of Smith's body at the morgue, the trial court ruled that the Commonwealth could establish through its photographs the nature, extent, and location of wounds "to show exactly what happened." Responding to Clanton's argument that the photographs would merely be cumulative evidence, the court stated that the medical examiner "could not possibly describe what these photographs show." The photographs showed that the ligature was pulled tightly around Smith's neck and twisted, and that there were lacerations of the victim's forehead, stab wounds on her throat, and a wound on her brow. They were relevant to a determination whether the killing of Smith was willful, deliberate, and premeditated. We cannot say that the trial court abused its discretion in admitting the photographs during the guilt trial. *See Waye* v. *Commonwealth,* 219 Va. 683, 692, 251 S.E.2d 202, 208, *cert. denied,* 442 U.S. 924 (1979).

That the photographs were admissible in the sentencing phase of the trial cannot be seriously challenged. They were relevant at that stage to prove the ferocity of the slaying and the nature and extent of the violent acts perpetrated upon the victim.

### III. *Arguments of the Commonwealth Attorney.*

Clanton says that the trial court erred in failing to instruct the jury to disregard improper arguments of the prosecutor. During closing argument in the guilt phase of the trial, the Commonwealth Attorney asserted that, in order to do what the defense attorney asked, the jury would have to say that three named police officers were "lying." When Clanton objected, the court suggested that it was not necessary to "put it in that perspective exactly," and the prosecutor indicated his acquiescence, but a colloquy ensued between the court and opposing counsel. The prosecutor agreed with the court's stated assumption that in the argument in question he was referring to Lawrence's testimony that she gave a statement incriminating Clanton only because of police harassment, and the testimony of three police officers denying such harassment. The trial court then stated that although as

argument on the credibility of opposing witnesses the prosecutor's statement was correct, since there was other evidence in the case, he would instruct the prosecutor not to argue in that manner. After the jury had retired to consider its verdict, Clanton's counsel stated for the record that he had approached the bench at the conclusion of the prosecutor's argument and requested the court to instruct the jury to disregard the argument to which he had objected, but that the court, concluding that such an instruction was unnecessary, had declined to give it.

Clanton says that the argument of the prosecutor created the erroneous impression that Clanton could not rely upon the presumption of innocence, and that to acquit the defendant the jury would have to determine that the testimony of the three police officers was false. Therefore, Clanton argues, it was the duty of the trial court *sua sponte* to instruct the jury to disregard the improper argument and to point out the correct law to be applied. We do not agree. The first written instruction given by the court, without objection, explained the presumption of innocence and the burden on the Commonwealth to prove every element of the offense beyond a reasonable doubt. The admonition given by the trial court to the prosecutor, even though couched in general terms, and the ensuing colloquy explained that the argument was directed only to the credibility of witnesses. Moreover, we find no merit in Clanton's contention that the prosecutor's argument improperly injected his personal opinion into the case. He was responding to argument made on behalf of Clanton which relied heavily on Lawrence's testimony.

 Clanton further objected to this part of the prosecutor's argument in the sentencing phase of the trial:

> It is a life of violence. Mr. Clanton tells you that he has found religion since he's been in the jail, and I don't mean to belittle it, but again, that's something that you hear quite frequently. Quite frequently. He knew he was facing a possible death sentence.

The trial court overruled the objection, stating that the prosecutor could suggest what may have happened, but that the jury did not have to accept the argument. Again, we reject Clanton's contention that this argument was an impermissible expression of the personal opinion of the prosecutor. Clanton had been convicted of

two violent crimes in addition to the capital murder, thus justifying the prosecutor's characterization of his life as one of violence. The prosecutor also could invite the jury to infer that Clanton's interest in religion may have been feigned because of his impending trial for capital murder and his knowledge that, if convicted, he might be sentenced to death.

Clanton says, however, that the most objectionable argument of the prosecutor in the sentencing phase of the trial was the following:

> Ladies and gentlemen, do not sentence — do not sentence — the other inmates of the Virginia State Prison to death at the hands of Earl Clanton. Don't give him the chance to take somebody else's life. Just because he's in prison —

When Clanton's counsel interrupted and objected, the trial court directed the prosecutor to refrain from that type of argument. Defense counsel did not ask the court to instruct the jury to disregard the argument. Rule 5:21. Nevertheless, the admonition of the trial court in the presence of the jury made it known to the jury that the court was not satisfied as to the propriety of the argument.

We hold that there was no duty on the part of the trial court to instruct the jury *sua sponte* to disregard this portion of the prosecutor's argument. It is the duty of defense counsel to move for a cautionary instruction where such an instruction is deemed necessary.

The propensity of the defendant to commit crimes of violence, however, is an important factor for the consideration of the jury in fixing punishment in a capital murder case. There was evidence of Clanton's commission of three violent crimes. It was not beyond the bounds of propriety, therefore, for the prosecutor to suggest that Clanton might kill an inmate if he were sentenced to life imprisonment.

### IV. *The trial court's answer to the jury's inquiry about parole.*

After retiring to determine the guilt or innocence of Clanton, the jury, through its foreman, submitted a question to the court. The question and the court's answer are as follows:

JURY FOREMAN: . . . The jury would like to know if capital murder charge is brought in and he is given life, would he be eligible for parole?

THE COURT: I can't answer your question. The reason why is this, the legislature and the Court feels it is best that that sort of thing is left to the parole authorities, this sort of thing, and not left to the judges or juries. In other words, you should sentence on what you think is proper and not be concerned with what happens later. Leave that to whoever other than the Judge or the jury to decide that based on what happens later. Of course, at this stage, you understand, if you find the capital murder, you would come back in for further information before you have to decide that, but does this answer your question at this point?

JURY FOREMAN: Yes, Your Honor.

Clanton did not object to the answer given by the court. Rule 5:21. He acknowledges that the court acted in accordance with existing case law, but he asks that we reconsider and reverse our rulings in *Stamper, supra,* and *Hinton* v. *Commonwealth,* 219 Va. 492, 247 S.E.2d 704 (1978), that juries are not to be instructed on parole. We decline to do so, and we reaffirm the principles approved in those cases.

■ Clanton argues in the alternative that the trial court erred in failing to comply with the requirement of *Hinton,* that when the question of parole eligibility is asked, the trial judge should only tell the jurors that if they find the accused guilty "they must impose such sentence, within the limits fixed by law, as appears to be just and proper, and that what might afterwards happen is of no concern to them." 219 Va. at 495, 247 S.E.2d at 706. The answer given by the trial judge in this case, however, comes within the parameters of the *Hinton* mandate. Although his answer included some additional and unnecessary explanatory words, there could be no misunderstanding of the judge's meaning that the jurors were to fix a sentence within the limits of the law, as set forth in the instructions, and were not to be concerned with what happens afterwards. In his substantive language, the trial judge followed the guidelines that we approved in *Coward* v. *Commonwealth,* 164 Va. 639, 646, 178 S.E. 797, 800 (1935), and reaffirmed in *Stamper* and *Hinton.*

*V. Whether the sentence of death was imposed under the influence of passion, prejudice, and other arbitrary factors as a result of an overly broad and vague construction of the capital murder statute and was excessive and disproportionate to the penalty imposed in similar cases.*

 Under Code §§ 19.2-264.2 and 19.2-264.4C[2] a jury may impose the death sentence upon either of the alternative findings therein specified. In the present case, the jury based its verdict upon both alternatives, finding that there is a probability that Clanton would commit criminal acts of violence that would constitute a continuing serious threat to society, and that his conduct in committing the capital murder of Smith was outrageously or wantonly vile, horrible or inhuman in the manner delineated in the statute.

Upon our review of the case, it is our responsibility under Code § 17-110.1[3] not only to consider any errors in the conduct of the trial, but also to consider and determine whether the sentence of death was improperly imposed. Heretofore, we have considered the errors assigned by Clanton to the denial by the trial court of his motion for a change of venue or venire, and to the conduct of his trial, and have determined that no error was committed. Finding nothing in the record to support Clanton's allegation, we hold that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

There was ample evidence to support the jury verdict based upon findings that Clanton had a propensity for violence and that

---

[2] Code § 19.2-264.4C provides as follows:

The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

[3] Code § 17-110.1 provides in pertinent part:

C. In addition to consideration of any errors in the trial enumerated by appeal, the court shall consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

\* \* \*

the capital murder of Smith was an offense of exceptional ferocity. Clanton had served eight years in prison in New Jersey for murder; the jury did not have to believe his testimony, offered in mitigation, that he merely acted as a lookout for other more active participants in what was planned as a robbery but ended in murder. Clanton subsequently had been convicted of felonious assault in Petersburg, but had avoided serving the sentence imposed for that crime by fleeing before he could be incarcerated. While a fugitive, he strangled Smith with a belt, stabbed and cut her with a knife, and bruised her about the head in robbing her of $8 in currency. Clanton's violent, aggressive, and antisocial temperament was clearly demonstrated, and the jury could reasonably find, as it did, that he would be a continuing serious threat to society.

The jury could also reasonably find, as it did, that Clanton's killing of Smith was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind, or aggravated battery to the victim. The evidence showed that Smith's blood was found throughout her apartment, on the floor, on a bed, on the walls, and on a television set. It is a reasonable inference that Clanton confronted Smith when she returned to her apartment, that he subdued her by forcibly placing and tightening the belt around her neck, and that he stabbed her repeatedly to compel her to surrender her money. The evidence also supports the reasonable inference that the struggle continued from room to room until Smith expired and that Clanton then ransacked her apartment before the unexpected arrival of the police prompted him to hide.

▆▆ To determine whether Clanton's sentence is excessive or disproportionate to the penalties imposed in similar cases, we have examined the records in all the capital murder cases reviewed by this Court.[4] We have upheld the imposition of death sentences in *Coppola, Stamper, Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980), *Linwood Earl Briley, Bassett* v. *Commonwealth,* 222 Va. 180, 284 S.E.2d 844 (1981), and *Whitley* v. *Commonwealth,* 223 Va. 66, 286 S.E.2d 162 (1982) where the capital murders were perpetrated in the commission of armed robbery. The evidence of extraordinary brutality in Clanton's killing

---

[4] *See Whitley* v. *Commonwealth,* 223 Va. 66, 286 S.E.2d 162 (1982) (this day decided). For purposes of comparison in the present case, we need not go outside the armed robbery-capital murder category for similar cases.

of Smith is comparable to that adduced in those six cases; indeed, it bears some striking similarities to the evidence in *Coppola* and *Stamper.*

In *Coppola,* the defendant bound his victim, repeatedly beat her head upon the floor, and strangled her with a sock to force her to reveal where money was hidden. In *Stamper,* the defendant murdered three employees in the restaurant where they worked. In fixing the penalty for capital murder of the employee in charge of the business, the jury based its verdict upon the defendant's proclivity for violence and also upon his conduct in committing the offense. Only this employee had the combination to the safe, which was found open, with money missing. A trail of blood led from the safe to the body of the employee, found dead with multiple lacerations, a skull fracture, a cut on his neck, and a gunshot wound in his chest. Upholding the death sentence, we noted that there was a reasonable inference that the employee had been tortured before he was shot to death. Likewise, in the present case, the jury could reasonably infer that Smith was tortured before she was killed by strangulation.

We conclude that Clanton's sentence is not excessive or disproportionate.

Finally, Clanton challenges the constitutionality of §§ 19.2-264.2 and 19.2-264.4C as overly broad and impermissibly vague, but he acknowledges that his argument on this question is identical with that presented to us in *Linwood Earl Briley.* We rejected the argument in that case, we reaffirm the views therein expressed, and we again reject the argument.

Finding no error in the judgment of the trial court, and no other reason to disturb or commute the death sentence imposed in this case, we will affirm the defendant's conviction and sentence.

*Affirmed.*