## Richmond

### DERICK LYNN PETERSON

### v.

### COMMONWEALTH OF VIRGINIA

April 29, 1983.

Record No. 822136.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, and Russell, JJ., and Harrison, Retired Justice.

*Charles A. Huffman, III,* for appellant.
*Richard B. Smith, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

On August 30, 1982, a jury found Derick Lynn Peterson guilty of capital murder in the commission of robbery while armed with a deadly weapon. In the second phase of the bifurcated trial, the jury fixed his punishment at death. The trial court confirmed the conviction and sentenced Peterson in accordance with the verdict. We have consolidated the mandatory review of the death sentence with Peterson's appeal of his conviction and have given the case priority on our docket. Peterson seeks reversal of his conviction and remand for a new trial, or in the alternative, commutation of his sentence to imprisonment for life.

About 6:00 p.m. on February 7, 1982, Howard Kauffman, an accountant, was counting receipts in the office of a Pantry Pride store. The top portion of the office enclosure was glass and Kauffman could be seen by customers and other employees in the store. Dwight Wilson, a cashier working 22 to 25 feet from the office, testified that he saw Kauffman kick the office door to prevent a man from entering, but the intruder opened the door, went to the upper level of the office, "grabbed a sack of money" from the desk, and came back down. As Kauffman stood facing him, the

man, who was undisguised, took out a gun, shot the accountant, and fled from the premises. Once the robber had entered the office, Kauffman offered no resistance. From photographs and line-ups, Wilson subsequently identified Peterson as the assailant.

Wanda Scott, another cashier, saw the intruder force his way into the office. Kauffman stepped back, but the man shot him, reached for something, and ran from the store. She could not say what the man carried away with him. She identified Peterson as the killer after seeing him in a lineup.

Donald Thomas, another employee, had been talking to Kauffman through the office window before the shooting. He saw a man who had been standing nearby run into the office, seize a money bag lying on the desk, pull a gun, shoot Kauffman, and run from the store. Thomas was about five feet from Kauffman when the shooting occurred. Although Thomas conceded that he had picked two different suspects, one of whom was Peterson, from the first photographs shown to him, he identified Peterson from a photograph of a lineup.

Another witness identified Peterson as the driver of a car running at high speed that forced her automobile to the side of the road as she approached the store immediately after the shooting. Two other customers were in the store when they heard a gunshot. They identified Peterson as the man whom they then saw running away with a gun in his hand. They remembered having seen the same man standing outside before they entered the store.

The medical examiner testified that the cause of Kauffman's death was a bullet wound to the abdomen; the bullet severed the iliac artery. There was evidence that extensive life-saving measures were used without success in an effort to revive him.

After the robbery, it was discovered that a bank money bag and more than $6,000 in cash and checks were missing from the store.

### 1. The Guilt Trial.

A. Admissibility of Photographs.

During the guilt trial, the Commonwealth offered in evidence as exhibits two color photographs of Kauffman taken after his death, one showing only his face and the other showing the entry wound in his abdomen made by the fatal bullet. The trial court admitted the photographs in evidence over Peterson's objection that, since Kauffman's identity and the cause of his death were not chal-

lenged, the photographs were unnecessary and could only be used to inflame the jury.

■ The admission in evidence of photographs of a murder victim's body is within the discretion of the trial court. *Whitley* v. *Commonwealth,* 223 Va. 66, 74-75, 286 S.E.2d 162, 167, *cert. denied,* 459 U.S. 882 (1982); *Waye* v. *Commonwealth,* 219 Va. 683, 692, 251 S.E.2d 202, 207-08, *cert. denied,* 442 U.S. 924 (1979); *Evans* v. *Commonwealth,* 215 Va. 609, 614, 212 S.E.2d 268, 272 (1975); *Brown* v. *Commonwealth,* 212 Va. 515, 518-19, 184 S.E.2d 786, 788-89 (1971), *vacated in part on other grounds and remanded,* 408 U.S. 940 (1972).

We held in *Clanton* v. *Commonwealth,* 223 Va. 41, 51, 286 S.E.2d 172, 177 (1982), that a "defendant . . . may not preclude the Commonwealth from introducing photographs by offering to stipulate facts shown in the photographs." In the present case, there is not even evidence of an offer to stipulate facts shown in the photographs.

The Commonwealth had the burden of proving, *inter alia,* that the killing was willful, deliberate, and premeditated. The location of the entry wound might tend to support an inference that the killer did not shoot wildly in panic but drew his weapon and took aim before firing. There were only two photographs, neither of them gruesome nor more inflammatory than the testimony of the eyewitnesses who observed the killing. We find no abuse of discretion by the trial court in admitting the photographs.

B. Sufficiency of the Evidence.

Peterson, who offered no evidence, attacks the sufficiency of the Commonwealth's evidence in two respects. First, he says the testimony of witnesses identifying him as the killer was too inconsistent to support his conviction. Second, he argues there was no evidence that the shooting was a willful, deliberate, and premeditated act. Considering the evidence in the light most favorable to the Commonwealth, we reject both contentions.

■ On brief, Peterson asserted that Wilson, Scott, and Thomas failed to identify him initially, that Wilson's identification was based upon Peterson's "hairline," and Scott's upon his "eyebrows and the fact that he was clean-shaven." But each of these witnesses positively identified Peterson. The uncontradicted evidence showed that the store was brightly lighted, that Peterson wore no

mask, and that his face was plainly visible to the witnesses. Wilson identified Peterson from a photographic array four days after the crime, identified him again in two different lineups, and identified him at the preliminary hearing and at trial. Scott could not remember whether she made an identification from a photographic array, but a detective testified that she had identified Peterson in that manner. She also identified him in a lineup, at the preliminary hearing, and at trial. Thomas identified Peterson's picture from a photograph of a lineup, and identified him at the preliminary hearing and at trial. It was for the jury to determine the credibility of the witnesses and the weight of the evidence. There was ample evidence identifying Peterson as the criminal agent.

It was also a jury question whether the killing of Kauffman was willful, deliberate, and premeditated. The testimony of the three eyewitnesses was that Kauffman made no aggressive move towards Peterson but merely stood facing him in the office. Two of the witnesses said that Peterson had the money bag in his possession before he took out his gun and shot the victim. There was only one shot; the bullet was fired in a declining trajectory directly into Kauffman's midsection. To establish premeditation, the intention to kill need only exist for a moment. *See Akers* v. *Commonwealth,* 216 Va. 40, 216 S.E.2d 28 (1975); *Bradshaw* v. *Commonwealth,* 174 Va. 391, 4 S.E.2d 752 (1939). There was evidence that Peterson had time after seizing the money bag to pull out his weapon and fire at Kauffman. There was evidence that Kauffman had tried to prevent Peterson from entering the office. The jury could reasonably infer that Peterson planned to commit armed robbery and to kill anyone who attempted to frustrate his purpose. The jury could reasonably conclude, therefore, that Peterson shot Kauffman to make certain that he would not attempt to impede the defendant's escape from the scene of the robbery. We hold the evidence was sufficient to support the jury's finding that the shooting was willful, deliberate, and premeditated.*

---

*The jury also found Peterson guilty of armed robbery and use of a firearm in the commission of a felony; the trial court entered judgment on the verdicts. Those convictions are not challenged in the present appeal.

## II. The Penalty Trial.

A. Procedural Questions Barred by Contemporaneous Objection Rule.

1. Time for conducting the penalty trial.

■ On appeal, Peterson for the first time complains that the trial court erred in proceeding almost immediately from the guilt trial to the penalty trial. No contemporaneous objection was made. Indeed, the trial judge informed the jury, without objection, at the conclusion of the guilt phase of the trial, that opposing counsel and the defendant were ready to proceed in approximately ten minutes if this was satisfactory with the jury. We will not now notice Peterson's objection. Rule 5:21.

2. Instruction No. 1A.

■ On appeal, Peterson for the first time objects to the granting of Instruction No. 1A, which informed the jury in the language of Code § 19.2-264.4(C) that the death sentence could be based on the vileness of the crime or the dangerousness of the defendant as those terms are explicated in the statute. Peterson states correctly that there was no evidence of vileness in the crime. A death sentence based upon vileness is not supported by the evidence where the victim died almost instantaneously from a single gunshot wound. *Godfrey* v. *Georgia,* 446 U.S. 420 (1980). But Peterson's counsel responded to the trial judge's inquiry at trial by stating affirmatively that he had no objection to the instruction. The Commonwealth did not argue vileness, and the jury based its verdict fixing punishment at death solely upon the finding that Peterson posed "a continuing serious threat" to society. We will not now notice this objection. Rule 5:21.

B. The Jury's Inquiry About Parole.

■ After retiring to fix Peterson's punishment, the jury returned to the courtroom and through its foreman asked the trial judge whether it was possible "to give a life sentence without parole." The judge replied as follows:

> The only response I can give you on that . . . is that it's the function of the jury, duty of the jury, to impose such

sentence as they consider just under the evidence and the instructions of the Court.

And you should not concern yourself with what may thereafter happen. It may not be a very satisfactory answer, but it's the only one I can give you.

Peterson did not object to the answer. Rule 5:21. He concedes that under *Clanton* v. *Commonwealth,* 223 Va. 41, 54-55, 286 S.E.2d 172, 179-80 (1982), and *Hinton* v. *Commonwealth,* 219 Va. 492, 247 S.E.2d 704 (1978), the judge's response was correct. He argues, however, that Code § 53.1-151(B)(1), which became effective July 1, 1982, after *Clanton* and *Hinton* were decided and after the Kauffman killing, changed the law by making a person convicted of three separate offenses of armed robbery ineligible for parole. We need not consider the effect of this statutory amendment, because we rely upon and reaffirm the principle enunciated in *Clanton* and *Hinton* that it is improper to inform the jury as to the possibility of parole. For this reason, it would have been improper for the trial court *sua sponte* to have offered a jury instruction based upon the 1982 amendment, even if, as Peterson now contends, the amendment applied to him.

C. Evidence of Other Crimes.

■ Peterson contends that the trial court erred in admitting evidence of other crimes for which he had been convicted but which were then pending on appeal. Conceding that under *Stamper* v. *Commonwealth,* 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied,* 445 U.S. 972 (1980), evidence of prior convictions is admissible in the penalty trial, he says that such evidence should not be admissible where he has pleaded not guilty to the charges and has appealed the convictions. We disagree.

Appeal of a criminal conviction does not affect the finality of the judgment, it only suspends execution of the sentence. Code § 19.2-319; *Hirschkop* v. *Commonwealth,* 209 Va. 678, 166 S.E.2d 322, *cert. denied,* 396 U.S. 845 (1969). Moreover, the proceedings of the trial court are presumed to be correct unless and until they are reversed on appeal, and the pendency of an appeal does not preclude use of a conviction for impeachment purposes. *See Bloch* v. *United States,* 226 F.2d 185 (9th Cir. 1955), *cert. denied,* 350 U.S. 948 (1955), *reh'd denied,* 350 U.S. 977 (1956); *United*

*States* v. *Empire Packing Co.,* 174 F.2d 16 (7th Cir.), *cert. denied,* 337 U.S. 959 (1949). *See also Bloch* v. *United States,* 238 F.2d 631 (9th Cir. 1956) (subsequent reversal of conviction used to impeach defendant at trial did not require new trial), *cert. denied,* 353 U.S. 959 (1957).

Code § 19.2-264.4 prescribes the evidence that may be admissible in the penalty trial of a capital murder case as including "the circumstances surrounding the offense, the history and background of the defendant," as well as mitigating evidence. Under this broad statutory language, it is clear that more than the mere police record of the defendant may be introduced. Evidence is made admissible that would not be admissible in the guilt trial. Thus, in *Stamper,* the testimony of the victim of an earlier crime of violence was properly admitted to show the dangerousness of the defendant in that case. 220 Va. at 275-77, 257 S.E.2d at 819-20. The statute does not restrict the admissible evidence to the record of convictions. In fairness to the defendant, however, the preferred practice is to make known to him before the trial the evidence that is to be adduced at the penalty stage if he is found guilty.

In the present case, the Commonwealth presented the testimony of two victims of armed robberies of which Peterson had been convicted. Sheila Coffey testified that she was robbed at gunpoint at a Revco store on January 15, 1982, by Peterson and an accomplice. She identified Peterson as the robber who held the gun on her. Garrie Anne Baize testified that she was working as a clerk at a Family Dollar store when she was robbed about 10:15 a.m. on February 8, 1982, the day after Kauffman was killed. She identified Peterson as the robber. Baize also related a threat made against her by Peterson at the conclusion of the preliminary hearing on the Family Dollar store charges against him. Her testimony was that as she was leaving the courtroom, Peterson, in handcuffs, told her, "I'll remember you, and I'm going to get you, you [expletive deleted]."

In addition, Probation and Parole Officer Sharon Bonville testified to Peterson's record as a juvenile and as an adult, including the offenses which Coffey and Baize described. Peterson's juvenile record began in 1974 at age 12. In 1977, he was committed to juvenile detention for armed robbery. In 1979, when he was an adult, he was convicted of breaking and entering and grand larceny.

## D. Sufficiency of the Evidence.

■ Peterson says the evidence was insufficient to support the jury's finding that he was a continuing serious threat to society and the trial court erred, therefore, in not striking this evidence. We reject this contention. There was ample evidence to support the jury's finding. Peterson's criminal record and his threat to harm a witness who testified against him in another case show an unmistakable proclivity for violence and an obvious unwillingness to abide by the laws of the land. Moreover, the jury could properly consider the capital murder itself in assessing the probability that Peterson would continue to commit acts of violence. Indeed, the only evidence to the contrary was the testimony of Peterson's mother that she had never known her son to be violent, had never seen him with a gun, and did not think he would commit other crimes if he were ever released.

## E. Presentence Review by the Trial Court.

The report required by Code § 19.2-264.5 was prepared and filed with the trial court by Probation and Parole Officer Bonville. This statute authorizes the trial court, after considering the report, to set aside the sentence of death and impose a sentence of life imprisonment. A hearing was conducted by the court on September 24, 1982, at which Bonville and two other witnesses testified in mitigation of punishment. Bonville stated that during the nine months Peterson spent in custody as a juvenile he "progressed fairly well," and when he was released the detention authorities "thought he was doing well." Bonville thought that Peterson needed vocational training and behavioral counselling.

Ann D. Clark, a neighbor, testified that she had known Peterson since he was nine or ten. She had always found him to be friendly and courteous, had never seen him carrying a weapon, and had never observed any violent behavior on his part. She was not aware of his criminal record.

Peterson's mother testified that Peterson was six when she and her husband separated and Peterson was "somewhat" of a disciplinary problem when he was growing up. Stating that her son's attitude improved after his detention as a juvenile, she asked the court to permit him to be rehabilitated rather than executed.

■ Peterson says that his age, 21 years, was a mitigating circumstance requiring the trial court to set aside the death sentence. We agree with the Commonwealth that Peterson's age does not *per se* preclude imposition of the death sentence. Age was merely a fact to be weighed by the jury. Thus, in *Giarratano* v. *Commonwealth,* 220 Va. 1064, 1066, 266 S.E.2d 94, 95 (1980), the defendant upon whom the death sentence was imposed was age 21 when he was indicted. Peterson's argument is without merit.

■ At the same hearing, Peterson moved the court to set aside the death sentence because of certain after-discovered evidence upon which he had based a motion for a new trial on his Family Dollar conviction. On September 22, 1982, a hearing in that case was conducted on his motion and Peterson presented the testimony of two alibi witnesses. However, neither could say where Peterson was at the time of the Family Dollar robbery. The trial court, finding that the evidence would not have produced a different result, denied the motion. Nevertheless, Peterson argues that the jury in the present case should have had the benefit of the testimony of his alibi witnesses in the Family Dollar case. The trial court disagreed and overruled the motion. We hold that the court did not err in this ruling. The proffered evidence was irrelevant; it did not qualify as after-discovered evidence in the present case. Moreover, it was found by the trial court not even to qualify as after-discovered evidence justifying a new trial in the Family Dollar case.

■ At the conclusion of the hearing on September 24, the trial court confirmed the jury verdict and sentenced Peterson to death. The trial judge stated, before imposing sentence, that the jury verdict was "fully justified and supported by the evidence," that the punishment fixed by the jury was just and appropriate, and that it was not reached by the jury "under the influence of passion, prejudice, or other arbitrary factors." We hold that the trial court discharged its obligation under Code § 19.2-264.5 and did not abuse its discretion in imposing the death sentence in accordance with the jury verdict.

### III. Sentence Review.

■ It is our duty under the provisions of Code § 17-110.1 to determine whether the death sentence was imposed under the influence of "passion, prejudice or any other arbitrary factor" or is

"excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

There is nothing in the record to suggest that the death sentence was imposed under any improper influence. Peterson relies upon the rulings of the trial court admitting the photographs of the victim, granting Instruction No. 1A, admitting the testimony of Baize that Peterson threatened her for testifying against him, and admitting evidence of Peterson's convictions of other crimes when those convictions were pending on appeal. We have heretofore demonstrated that Peterson's challenges to these rulings were without merit.

As the record shows, Peterson was in constant difficulty with the juvenile authorities from an early age. As a juvenile he was committed to detention for armed robbery at age 15; as an adult he was convicted of breaking and entering and grand larceny. He was convicted of armed robbery and a related offense committed approximately three weeks before the shooting at the Pantry Pride store. He was convicted of armed robbery and a related offense committed the next day after the Kauffman slaying. He threatened a witness who testified against him. All this evidence, which the jury and the trial judge obviously accepted, showed Peterson to be a dangerous man who would probably commit other acts of violence if given any opportunity to do so. Accordingly, we hold that the death sentence was not influenced by any arbitrary factors.

If juries generally in this jurisdiction impose the death sentence for conduct similar to that of the defendant then the sentence is not excessive or disproportionate. *Quintana* v. *Commonwealth,* 224 Va. 127, 151-52, 295 S.E.2d 643, 655-56 (1982), *cert. denied,* 460 U.S. 1029 (1983); *Giarratano* v. *Commonwealth,* 220 Va. 1064, 1079, 266 S.E.2d 94, 103 (1980); *Stamper* v. *Commonwealth,* 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied,* 445 U.S. 972 (1980). Accordingly, we have examined the records in all capital-murder cases reviewed by this Court, with particular emphasis given those cases in which the death sentences were based upon the probability that the defendants would be continuing threats to society. Thus, in *Stamper,* where the defendant was convicted of murdering three victims during the commission of armed robbery, two of the death sentences were based solely upon his proclivity for violence. Except for the multiple murders for which he was then being sentenced, his only previous convic-

tion of a violent crime was for armed robbery. 220 Va. at 277, 257 S.E.2d at 820. In *Evans* v. *Commonwealth,* 222 Va. 766, 779, 284 S.E.2d 816, 823 (1981), *cert. denied,* 455 U.S. 1038 (1982), the defendant had previously been convicted of several assaults but had received a substantial prison sentence only for the most recent offense—assault with a deadly weapon inflicting serious injuries. In *Bassett* v. *Commonwealth,* 222 Va. 844, 850, 284 S.E.2d 844, 849 (1981), *cert. denied,* 456 U.S. 938 (1982), the defendant had previously been convicted of unlawful wounding, statutory burglary, escape, and armed robbery. The death sentence in *Giarratano* was based on dangerousness of the defendant although the capital murder (rape-murder of a juvenile) was unusually horrible and was followed by the murder of the victim's mother to prevent her from reporting the crime. The defendant had previously been convicted of many drug offenses and several assaults but no major crimes of violence. 220 Va. at 1075-76, 1078-79, 266 S.E.2d at 101, 103.

We have also affirmed the imposition of death sentences based upon both vileness of the capital murders and dangerousness of the defendants. In *Clanton,* for example, the defendant had previously been convicted of murder and of unlawful wounding. 223 Va. at 49, 286 S.E.2d at 176. There was evidence in *Quintana* of the defendant's plotting to take hostages and to commit other acts of violence. 224 Va. at 147, 295 S.E.2d at 653. In *Turner* v. *Commonwealth,* 221 Va. 513, 525 n.11, 273 S.E.2d 36, 44 n.11 (1980), *cert. denied,* 451 U.S. 1011 (1981), the defendant had previously been convicted of malicious maiming, escape, unlawful wounding, malicious wounding, and second degree murder. The defendant in *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 578, 273 S.E.2d 57, 66 (1980), had previously been convicted of armed robbery and attempted murder. In *Linwood Earl Briley* v. *Commonwealth,* 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied,* 451 U.S. 1031 (1981), the atrociousness of the capital murder was so great that the previous record of the defendant was irrelevant to a determination that he would be a public menace.

From our examination of the record, and our comparison of Peterson's record and history with those of other defendants in capital-murder cases, we conclude that juries generally in this jurisdiction impose the death sentence for conduct similar to that of Peterson. The sentence imposed in this case, therefore, is not excessive or disproportionate.

We hold that the trial court committed no error in either the guilt or the penalty trial and we further hold, based on our independent review, that the sentence of death was properly imposed. Accordingly, we will affirm the judgment.

*Affirmed.*