826 F.2d 1354
 Earl CLANTON, Plaintiff-Appellee,
v.
Toni V. BAIR, Warden; Attorney General of the State of
Virginia, Defendants- Appellants (Two Cases).
Earl CLANTON, Plaintiff-Appellant
v.
Toni V. BAIR, Warden; Attorney General of the State of
Virginia, Defendants- Appellees.
 Nos. 86-4002 to 86-4004.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 6, 1987.
Decided Aug. 20, 1987.
 
 Thomas Drummond Bagwell, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen. of Va., Richmond, Va., on brief), for defendants-appellants.
 William Benjamin Moffitt (Thomas Rawles Jones, Jr., Lisa Bondareff Kemler, Moffitt & Jones, Alexandria, Va., on brief), for plaintiff-appellee.
 Before HALL and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 HAYNSWORTH, Senior Circuit Judge:
 
 
 1
 Clanton, a prisoner of the Commonwealth of Virginia under a sentence of death for capital murder, sought a federal writ of habeas corpus. There were many allegations of deficiencies in the representation provided by his trial lawyer. The district court rejected most of them facially, but conducted a hearing with respect to two of them. It then granted the writ upon the ground of inadequate preparation of the trial lawyer for the sentencing phase of the trial. 638 F.Supp. 1090. The specific finding was that the lawyer had failed to insist upon a psychiatric examination of his client, an examination which might have disclosed extensive child abuse that Clanton had disclosed for the first time to his habeas lawyer shortly before the federal hearing. Clanton has cross-appealed from the order denying the writ upon two other alleged deficiencies in the representation provided by the trial lawyer.
 
 
 2
 We find no deficiency of constitutional magnitude in the representation by the trial lawyer, and reverse the order granting the writ. On Clanton's cross-appeal, we affirm.
 
 
 3
 Many of the factual references are taken from the comprehensive opinion of the Supreme Court of Virginia when it had Clanton's conviction and sentence under direct review. Clanton v. Commonwealth, 223 Va. 41, 286 S.E.2d 172 (1982).
 
 I.
 
 4
 Clanton's parents separated when he was very young. For a number of years he lived with his father, but then went to New Jersey to live with his mother. He was soon in trouble with the juvenile authorities, and, at age seventeen, was convicted in New Jersey of murder upon a plea of no contest. When he was paroled after serving a number of years in prison, he returned to Petersburg, Virginia where his mother was then living. Soon again he was in trouble and was brought to trial for unlawful injury to one Bruce Brown whom Clanton had beaten with brass knuckles on his fist.
 
 
 5
 During a recess in the trial, Clanton walked away and became a fugitive. The trial concluded in his absence, and he was sentenced to four years in prison upon a judgment of conviction.
 
 
 6
 Clanton then moved into the apartment of Natalie Lawrence. The door to her apartment opened upon the same stairway landing as that of Wilhemina Smith.
 
 
 7
 Shortly after noon on a November day in 1980, residents of two apartments on the floor below saw Wilhemina Smith drive into the parking lot after a shopping trip. When she reached the top of the stairs at the entrance to her apartment, both residents heard her say something to the effect of, "What have I done to you? Why this?" They heard the door slam and then screams from Ms. Smith and much other noise coming from her apartment. One of the residents then called the police. They saw no one descend the stairs between the time that Wilhemina Smith mounted them and the arrival of the police.
 
 
 8
 Upon arrival, the police found the door to Ms. Lawrence's apartment ajar. They looked in, but no one was present. They then knocked on the door of Ms. Smith's apartment. A woman answered saying that she was in the shower and it would take her a few minutes to get dressed. The police were insistent, however, and the locked door was opened by Natalie Lawrence.
 
 
 9
 The police found blood in the living room of Ms. Smith's apartment. They found Ms. Smith dead on the floor of her bedroom. Death was by strangulation with a cord-like belt around her neck. There were also stab wounds on her face and neck with a great deal of blood. A further search of the apartment revealed Clanton hiding beneath the bed in a second bedroom. There was blood on his hands and clothing, though he was not wounded or bleeding. Four bills, aggregating $8, were found wadded in his trouser pocket. There were blood stains on them. Ms. Smith's open purse was found, apparently having been ransacked. There were no bills in it.
 
 
 10
 Clanton insisted that he was innocent and that he wanted to tell his story on the witness stand. It was a bizarre story.
 
 
 11
 According to Clanton, he and Ms. Lawrence were in her apartment when they heard Ms. Smith screaming. Ms. Lawrence urged him to lend a hand to Ms. Smith, and he undertook to do so. In the living room of the Smith apartment he was attacked by an intruder. They fought until the intruder fled through the apartment door. He then entered Ms. Smith's bedroom where he saw Ms. Smith lying on the floor stabbed and garrotted. He got blood on his hands and clothing during his attempt to assist her, but he was then attacked by a second intruder. He fought with the second man. His bloody handprint was left on a wall when he "pushed off" to deliver a karate kick. The second intruder fled.
 
 
 12
 Clanton testified that he wished to notify a relative of Ms. Smith. He thought her checkbook might be an address book and picked it up to examine it. That was his explanation of his bloody fingerprint on the checkbook.
 
 
 13
 When the police arrived and demanded admittance, Clanton hid beneath the bed in the other bedroom because he was a fugitive and wished to avoid being discovered by the police.
 
 
 14
 Natalie Lawrence was called as a witness for the defense to corroborate his statement. She substantially did that.
 
 
 15
 According to Ms. Lawrence, after hearing Ms. Smith's screams she first went to investigate. She found the key in the door to Ms. Smith's apartment and admitted herself, but because of the commotion in the bedroom, she returned to her apartment and sent Clanton to the rescue.
 
 
 16
 Looking through the peephole in the doorway of her apartment, she saw an intruder flee. As she reentered the Smith apartment, a second intruder fled.
 
 
 17
 Ms. Lawrence had given the police a statement in which she had said that Clanton was the assailant and that he had told her in advance of his intention to choke and rob Ms. Smith. On the witness stand, she said the statement was false, as the product of police coercion, including threats to take her child from her.
 
 II.
 
 18
 After the jury's guilty verdict, during the sentencing phase of the proceeding, Clanton testified that he had been a Muslim but that during his incarceration after the death of Ms. Smith he had been attending Christian Bible classes. He produced certificates attesting his attendance.
 
 
 19
 That was the only evidence of any mitigating circumstance.
 
 III.
 
 20
 Clanton's trial lawyer knew that Clanton's parents had separated when Clanton was very young and that, after having lived with his father for a number of years, Clanton moved to New Jersey to live with his mother. Clanton told him that otherwise his childhood had been substantially normal. Clanton told the officer who had made the presentence investigation that his childhood had been good, and that statement was included in the presentence report. At the sentencing hearing, Clanton gave no indication of any problems at home during his childhood.
 
 
 21
 Shortly before the federal hearing, however, Clanton told his habeas lawyer a different story. He was frequently beaten by his father and sexually abused by his father's paramour. When he went to live with his mother, she was working as a barmaid and prostitute. She was home infrequently, and, when she was, she usually had some man with her. She became angry with Clanton when he refused to have sexual relations with her, and falsely charged him with theft, a charge which got him in trouble with the juvenile authorities.
 
 
 22
 The district court recognized that this new story of Clanton's childhood may have been more a product of fear of execution than of devotion to truth. The district court also recognized that Clanton would not have told his trial lawyer all these things no matter how deeply the trial lawyer probed.
 
 
 23
 Nothing was presented in corroboration of any aspect of the new story. By that time, Clanton's father was dead, but the mother was living in Petersburg. No one inquired of her. There were several living siblings, but no one inquired of any one of them.
 
 
 24
 Nevertheless, the district court concluded that a psychiatrist, during a thorough psychiatric evaluation, might have uncovered the child abuse that Clanton had endured and been able to present it in some credible fashion.
 
 
 25
 The trial lawyer had told Clanton that a psychiatric evaluation might be helpful, but Clanton obstinately rejected the suggestion. He would not consent to any such evaluation.
 
 
 26
 The trial lawyer did not interview Clanton's mother or his siblings in search of evidence of some mitigating circumstance, but, according to the attorney, Clanton was insistent that they not be involved. Clanton particularly wished to avoid any inquiry of his mother. His position was that he was not the murderer of Ms. Smith, and he wished to stand upon his innocence.
 
 
 27
 Impressed with the fact that the only mitigating circumstance presented during the sentencing phase of the hearing was Clanton's attendance, while incarcerated, at the Christian Bible study classes, the district court concluded that the trial lawyer's preparation for the sentencing stage of the proceeding was inadequate and insufficient. The court thought that the lawyer might have been more insistent upon his recommendation of a psychiatric evaluation, for it offered the best or only chance of uncovering the abuse suffered by Clanton during his childhood that may have warped his personality. He might have interviewed Clanton's mother and siblings despite his client's wishes. What such inquiries might have disclosed is unknown, except that his mother testified at the state habeas hearing that Clanton had helped her raise his younger siblings. She gave no indication of any problems with Clanton other than an occasional larceny and addiction to drugs at one time. His brother testified at the same hearing that after Clanton's return to Petersburg from prison in New Jersey he had worked with youngsters in athletic pursuits. That interval was shortlived, of course, for it ended with Clanton's vicious attack with the brass knuckles upon Brown.
 
 
 28
 Clanton's new version of his childhood is entirely uncorroborated. His father had died, but his mother and siblings are still living. Apparently, no one sought any information from them. The new story is flatly contradicted, of course, by what Clanton told his trial lawyer and the author of the presentence report, the accuracy of which Clanton affirmed in open court.
 
 
 29
 If there is any kernel of truth in the new story, one may wonder why Clanton did not tell it sooner. There may have been some reluctance in telling others that his mother had been a prostitute and had harbored incestuous desires so strongly she falsely charged her young son with theft when he declined to satisfy her wishes. The father is dead now, however, and there is no apparent reason for reluctance in telling of mistreatment by his deceased father and his father's paramour.
 
 
 30
 Whether or not there is any kernel of truth in Clanton's current story of child abuse, he gave his trial lawyer no intimation of it. Indeed, he told the trial lawyer that, except for having been shuttled from one parent to the other, his childhood had been essentially normal. He told the author of the presentence report the same thing. The only apparent reason for the lawyer's suggestion of a psychiatric evaluation appears to have been that Clanton has some history of criminality and violence. The history of violence, however, was not overwhelming. According to Clanton, his role in the capital murder in New Jersey was service as a lookout. That it was not he who had done the actual slaying is strongly suggested by the fact that his plea of no contest was accepted and a relatively short prison sentence was imposed. His use of brass knuckles in his thrashing of Brown was violent, but not necessarily life threatening and he stoutly contended that he had not attacked and murdered Ms. Smith. If one believed his version of the death of Ms. Smith, Clanton's history of violence would not be egregious.
 
 IV.
 
 31
 The standard for an assessment of a claim of ineffective assistance of counsel as a deprivation of the constitutional right to counsel is derived from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail, the claimant must show inadequate representation, as measured by a standard of reasonably effective assistance under the circumstances, resulting in prejudice to the claimant, Id. 466 U.S. at 687, 104 S.Ct. at 2064. There is a strong presumption that the performance of trial counsel was adequate, and courts are to avoid the use of hindsight to elevate a possible mistake into a deficiency of constitutional proportion. Id. at 689, 104 S.Ct. at 2065; Roach v. Martin, 757 F.2d 1463, 1476-77 (4th Cir.), cert. denied, 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985). See Burger v. Kemp, --- U.S. ----, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).
 
 
 32
 When Clanton rejected his trial lawyer's suggestion of a psychiatric evaluation, there was no basis for the lawyer's insistence upon it. Clanton seemed lucid and rational. He gave no indication of any mental or emotional problem. There was no doubt of his competence to stand trial and nothing suggestive of a possible defense of insanity at the time of commission of the murder.
 
 
 33
 That the trial lawyer knew that Clanton as a boy had been shuffled from the custody of one parent to that of another is much too slender a reed upon which to require that the lawyer's suggestion of psychiatric evaluation be pressed to the point of stout insistence. Clanton talked to the lawyer about his childhood, with no suggestion of abuse, and he told the probation officer that his youth had been basically good. When a seemingly lucid and rational client rejects the suggestion of a psychiatric evaluation and there is no indication of a mental or emotional problem, a trial lawyer may reasonably forego insistence upon an examination. See Proffitt v. United States, 582 F.2d 854, 858-59 (4th Cir.1978); United States ex rel. Rivera v. Franzen, 794 F.2d 314, 316-17 (7th Cir.), cert. denied, ------ U.S. --------, 107 S.Ct. 588, 93 L.Ed.2d 590 (1986). There is no constitutional basis for a rule that would require a psychiatric evaluation in every capital case. See Springer v. Collins, 586 F.2d 329, 332-33 (4th Cir.1978), cert. denied, 440 U.S. 923, 99 S.Ct. 1252, 59 L.Ed.2d 477 (1979); cf. Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
 
 
 34
 The district court relied upon our unpublished decision in Clark v. Townley, 791 F.2d 925 (4th Cir.1986), but that case does not support the district court's conclusion in this case. As here, Clark was charged with a capital offense and his trial attorney failed to pursue psychiatric evidence. Clark's lawyer, however, had a psychiatrist's report calling attention to possible mental and emotional problems of Clark and recommending that he be given a more thorough examination. Clark admitted the killing and felt no remorse about it. He had done it for the money, the excitement and the thrill. The only possible defensive tactic was further pursuit of the psychiatrist's recommendation of a more thorough examination of Clark's mental and emotional condition. Clark's case was nothing like this one.
 
 
 35
 In this case, the trial lawyer had no reason to foresee that his client might change his story of his childhood to one of parental abuse. Had the attorney done so, he could have done more than he did to flush the matter out before trial, but there was no reason to foresee such an eventuality. The lawyer may have had reason to doubt his client's version of the slaying of Ms. Smith, but he had no reason to doubt the truthfulness of his client's statements to him and to the probation officer about his childhood history. If we now assume that Clanton, before trial, was lying about his childhood history, the lawyer had no reason to suspect it; if we assume that he was being truthful then, no psychiatrist could have ferreted out the later lie.
 
 
 36
 We find no deficiency in the lawyer's performance.
 
 V.
 
 37
 There is no merit in the cross-appeal.
 
 A.
 
 38
 Plaintiff contends that his trial lawyer's performance was so deficient as to be constitutionally inadequate because he called Ms. Lawrence as a witness. The lawyer's only reasonable option, however, was to do what he did.
 
 
 39
 Clanton was insistent upon his right to tell his story from the witness stand. By his own testimony, Ms. Lawrence was in the Smith apartment before him, and the police had testified that it was Ms. Lawrence who sought to delay their entry into the Smith apartment and then admitted them. Since the jurors knew that Ms. Lawrence had been present, it would have been disastrous if the defense had not presented Ms. Lawrence as a corroborating witness or demonstrated the impossibility of her presentation.
 
 
 40
 The trial lawyer knew of Ms. Lawrence's prior inconsistent statements. He knew that she would be a weak witness because her credibility would be suspect. He told Clanton so. Prudently, on direct examination, he asked Ms. Lawrence about one of the prior inconsistent statements. She admitted that she had made the statement and sought to explain it as the product of coercion, including threats to take her child away from her. It was better that way, instead of leaving the matter of inconsistent statements to be brought out on cross-examination.
 
 
 41
 Clanton contends that Ms. Lawrence's statement to the police, that Clanton had told her that morning that he was going to choke and rob Ms. Smith, was the only evidence of premeditation, but that simply is not true. The residents of the floor below heard the confrontation on the stairway landing as Ms. Smith returned from her shopping trip. Her inquiry, "What have I done to you," strongly suggests that the confrontation was threatening. The attack occurred inside her apartment in the living room and in her bedroom, and the residents below had testified to hearing her initial screams and the later tumult. There is no room for a suggestion that she enticed her assailant into her apartment, or provoked the attack by aggressive action on her part. Everything points to the fact that she was a passive victim of an assailant bent upon robbing and injuring her.
 
 
 42
 Furthermore, premeditation may be established by showing that the intention to kill existed only a moment before the act. Peterson v. Commonwealth, 225 Va. 289, 302 S.E.2d 520, 524, cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983). See also Clozza v. Commonwealth, 228 Va. 124, 321 S.E.2d 273, 279 (1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).
 
 B.
 
 43
 Clanton also faults the trial lawyer for not having moved for a directed verdict of acquittal on the robbery charge at the close of the Commonwealth's case. He asserts that the prosecution failed to prove that he took something of value from Ms. Smith, an element necessary for robbery, and in turn, capital murder.
 
 
 44
 One of the policemen testified that the wadded up $5 bill and the three $1 bills were removed from the left front pocket of Clanton's trousers. There were bloodstains on the bills, but none on the interior of the left front trouser pocket. This is suggestive of nothing, however, for the light bloodstains could have been on the bills before they were wadded up and placed in the pocket, and the wad could have been placed without necessarily soiling the pocket. If the wadded bills did come from the left front pocket, it would demolish Clanton's contention that the wad was in his pocket all the while and became bloodstained by seepage through his clothing. Blood had seeped through his clothing to stain the inside of the right front pocket, but the policeman's testimony that they were retrieved from the left front pocket is entirely consistent with the prosecution's case.
 
 
 45
 Moreover, substantial evidence supports the inference that the money came from Ms. Smith's purse. She had just returned from a shopping trip. Her open purse was found on the floor. Apparently it had been ransacked, but it contained no money. Clanton was not bleeding, but he had Ms. Smith's blood all over him. His fingerprint in blood was left on her checkbook, and it is reasonable to believe that the money became lightly stained as he handled it before placing it in his pocket.
 
 
 46
 We see no obvious basis for a motion of acquittal, and no basis for a conclusion that the trial lawyer's representation was deficient for not having made such a motion.VI.
 
 
 47
 Since we find no basis for a conclusion that the trial lawyer's performance was deficient in any way, we reverse the judgment of the district court directing issuance of the writ unless the Commonwealth affords Clanton a new sentencing hearing.
 
 
 48
 REVERSED IN PART; AFFIRMED IN PART.